**UNITED STATES of America, Plaintiff,**

v.

**The GILLETTE COMPANY, Defendant.**

### Civ. A. No. 68–141.

United States District Court, D. Massachusetts.

Dec. 30, 1975.

---

Julie Murray, David Goldsweig, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

G. Marshall Moriarty, Edward Hanify, Ropes & Gray, Boston, Mass., for Gillette Co.

Peter B. Ellis, Foley, Hoag & Eliot, Boston, Mass., for Sperry Rand Co.

Alexander W. Sierck of Sierck, Wald, Harkrader & Ross, Washington, D. C., for Ronson Co.

## OPINION

ALDRICH, Senior Circuit Judge.

The matter of a proposed consent decree in this government-initiated civil antitrust suit, heard preliminarily on October 10 in response to a motion filed

October 7, 1975, is again before the court. As a result of the opinion of October 14 and later, more explicit, court suggestions, as well as further hearings and extensive memoranda and affidavits filed by opposers and conferences between counsel, including counsel for opposers, the parties have modified the stipulated decree in a number of particulars.[1] The question now is whether approval of this decree in its present form would be in the public interest. 15 U.S.C. §§ 16(b)–(h).

■ The extent of the burden that this new statute, the Antitrust Procedures and Penalties Act, hereinafter sometimes the act, places upon the court was adverted to in the October 14 opinion, of which this is a continuation.[1A] Taken literally, the burden is impossible. The legislative history shows clearly that Congress did not intend the court's action to be merely pro forma, or to be limited to what appears on the surface. Nor can one overlook the circumstances under which the act was passed, indicating Congress' desire to impose a check not only on the government's expertise—or at the least, its exercise of it—but even on its good faith. See 120 Cong. Rec. S 20862 (daily ed. Dec. 9, 1974); BNA Antitrust & Trade Reg. Report No. 630, at A–15 (1973). At the same time, both by the statute's listing various alternatives short of a comprehensive examination, 15 U.S.C. § 16(f), and by the announced expectancy of both congressional committees, the court is adjured to adopt "the least complicated and least time-consuming means possible." See S.Rep. No. 93–298, 93d Cong., 1st Sess. 6 (1973): H.Rep. No. 93–1463, 93 Cong., 2d Sess. 8 (1974), 1974 U.S.Code Cong. & Admin.News 6539. In this situation the court cannot provide the best of all possible words. Just as the parties are compromising, so in its process of weighing the public interest, must the court.

This seems neither improper nor unwise. Fear has been expressed that the act's "elaborate procedure . . . will prove counterproductive and may, indeed, undermine [by placing too great obstacles on the consent process] effective enforcement of our antitrust laws." Handler, Antitrust—Myth & Reality in an Inflationary Era, 50 N.Y.U.L.Rev. 211, 243 (1975). Courts' involvement in preventing potential harm to competition can become excessive. Cf. Emhart Corp. v. USM Corp., 1 Cir. 1975, 527 F.2d 177. I agree that in terms of the important role of the consent decree in antitrust procedure, too much tillage can destroy the garden.

Nor do I think Congress had, in fact, any contrary intention. The Senate Judiciary Committee reported that a high percentage of government antitrust actions are settled prior to trial, and recognized that the consent decree process was a "legitimate and integral part of antitrust enforcement." S.Rep., ante, at 3, 5. "Obviously, the consent decree is of crucial importance as an enforcement tool, since it permits the allocation of resources elsewhere." S.Rep. at 5. "[T]he Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool." S.Rep. at 7. "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong.Rec. 24598 (1973).

I believe that the examination which has been offered the court has more than met the requirements of the act, and that there is ample to permit a considered decision. The record is both open and extensive, including notations of my own observations. While in some cases I would feel called upon to make a number of subsidiary findings to support conclusions, in this instance it is largely

1. The court would like to express appreciation to both opposers for valuable suggestions and assistance.

1A. That preliminary, inquisitive opinion contains nothing of precedential or permanent value, and is not released for general publication.

unnecessary. I comment, accordingly, only briefly.

■ With regard to the government's good faith, I have not the slightest reason to suspect otherwise. Nor has there been any contrary suggestion as a result of the proceeding's statutory publicity. 15 U.S.C. § 16(c). One of the opposers still attacks the wisdom of the decree. Here I make one final generalization. It is not the court's duty to determine whether this is the best possible settlement that could have been obtained if, say, the government had bargained a little harder. The court is not settling the case. It is determining whether the settlement achieved is within the reaches of the public interest. Basically I must look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass.[2]

■ First, I note that, because of the modifications made in the decree, one of the original objectors, Sperry Rand, perhaps the more active of the two, has withdrawn its objections by letter dated December 23, 1975.[3] I attach considerable weight to this withdrawal. The other objector, Ronson, by letter dated December 22, 1975, although conceding that "significant" improvements have been made, does not affirmatively withdraw previous objections, but it presently recites only two. These I shall deal with, post.

■ Speaking generally, the government's complaint asked for a complete divestiture of all of the assets of the Braun Company, and this is not being accomplished. . But Braun is· a German company, with its manufacturing facilities ·abroad, and its principal șales, in fact its only sales of electric shavers after the termination of its relationship with opposer Ronson on December 31, 1974, being in Europe and elsewhere, outside the United States. I cannot think it realistic to expect complete divestiture of those outside interests; indeed no one really suggests it. This is, after all, a compromise. The question, rather, is whether I can find, within the scope of examination outlined, that the divestiture of Braun's present capacity to sell electric shavers domestically is adequate, and adequately accomplished. The difficulty, of course, is that defendant cannot simply sell the stock of the assertedly wrongfully acquired company—there is no domestic company, or, for that matter, present domestic business, to sell. On the other hand, the decree's creation of New Company to receive the domestic capacity is not so unique as opposers at one time contended. It was suggested, in fact, in a case with which this court happens to be quite familiar. See *United States v. United Shoe Mach. Corp.,* 1968, 391 U.S. 244, 247, 88 S.Ct. 1496, 20 L.Ed.2d 562.

Nor do I consider that I must, with the exception of complete divestiture, require that defendant do everything that opposers may wish. Gillette could always do something more. A point, however, comes where an agreement ceases to be a compromise.

A matter that gives me some pause is Ronson's contention that there should be an affirmative agreement by Gillette not to enter the dry shaving market by means of technology acquired from Braun for a period of years, ten being the period presently sought. I do not accept the government's reply, if it could be said to have gone that far, that such a provision would, per se, be in violation of the Sherman Act. See *Ford Motor Co. v. United States,* 1972, 405 U.S. 562, 575 & n. 10, 92 S.Ct. 1142, 31 L.Ed.2d 492. At the same time, such a restric-

---

**2.** At the· same time I have not forgotten that it was agreed that the court was not to· weigh as . one element of the settlement the possibility that the government might have lost on the merits at trial. The decree is to be tested on the basis of the relief provided, on the assumption that the government would have won.

**3.** This letter states Sperry Rand's interpretation of the decree's provisions with respect to three matters. In have no contrary thought, nor has Gillette subsequently expressed any.

tion would present problems. Had Gillette not purchased Braun, or if the government had been able to effect a complete divestiture, both companies would be free to enter the domestic market, Braun with its patents and established production capabilities, and Gillette with its selling experience and familiarity with the American market. If Ronson's suggestion were to be adopted, the result of the government's suit would be to bar both Braun and Gillette from the domestic dry shaving market for a decade, and leave only New Company, whose claimed potential weakness is the very basis for Ronson's pro bono publico concern. Quite apart from whatever may be Gillette's position on the matter, now limited to a declaration that it has no present intent to enter, I can quite understand the government's reluctance to make a binding agreement, or guarantee, that New Company would be the single new actual or potential occupant in this arena of competition, or even that Gillette is to be handicapped by a very difficult—both from the standpoint of observance and enforcement—quarantine.

Ronson further urges that Gillette's present commitment to New Company's purchaser to supply Braun products for five years after divestiture should be enlarged to ten, as a further assurance of New Company's viability. There would be no legal impediment as to this, but it would be a substantial change in the agreement reached by the parties.

Ronson has advanced both of these proposals from the beginning. If I were persuaded that they were essential to New Company's success I would reject the decree for failure to accept them. However, the consequences of not adopting them have been explored by affidavits and otherwise, and I have not been persuaded. The length of the supply contract is one of the matters which could always be improved, but for which I cannot draw a fine line. Within the limits of the standards previously discussed under which I am to act, I am of

opinion that the present decree is a satisfactory compromise from the standpoint of relief, and is in the public interest.