position were obviously dissimilar to those of the plaintiff.

"To show a prima facie case [of discrimination in pay] [plaintiff] must prove she performed substantially equal work as her [fellow employees] but was paid less for it." *Heymann v. Tetra Plastics Corporation*, 640 F.2d 115 at 120 (8th Cir., 1981) (quoting *Strecker v. Grand Forks County Social Services Board*, 640 F.2d 96 (8th Cir., 1980). The Court cannot conclude that the defendants paid plaintiff less money than white and/or male employees who performed substantially the same work as the plaintiff.

 The fact that plaintiff was one of a very small percentage of minority employees at CARL is a factor of some weight but it is certainly not determinative. *King v. Yellow Freight System, Inc.*, 523 F.2d 879 (8th Cir. 1975).

Finally, the Court finds that there was no evidence of plaintiff's alleged harassment by defendant Welch; the evidence shows only that Welch and other CARL employees brought errors in MCA documents to plaintiff's attention in order to instruct the plaintiff on the correct way to complete those documents.

As to Count II, the Court's conclusions are identical to those applicable to Count I insofar as Count I alleged racial discrimination in various forms. *See Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

As to Count III, the Court's conclusions are identical to those applicable to Count I insofar as Count I alleged that plaintiff was paid less than male employees of CARL. The provisions of 29 U.S.C. § 206(d) are to be construed *in pari materia* with the provisions of Title VII relating to discrimination in pay on the basis of sex. *Cullari v. East-West Gateway Coordinating Council*, 457 F.Supp. 335 (E.D.Mo.1978).

Accordingly, the Court will enter judgment in favor of defendants on all three counts of plaintiff's complaint.

The defendants' request for an award of attorneys' fees will be denied because the Court does not find that this action was frivolous, unreasonable, or groundless. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).

UNITED STATES of America

v.

AGRI–MARK, INC., Agway, Inc. and H. P. Hood, Inc.

Civ. A. No. 80–174.

United States District Court,
D. Vermont.

April 1, 1981.

Michael P. Harmonis, Kenneth L. Jost, Richard W. Pierce, Antitrust Division, Dept. of Justice, Washington, D. C., and William B. Gray, U. S. Atty., Dist. of Vermont, Burlington, Vt., for plaintiff.

Thomas F. Tresselt and H. Martyn Owen, Shipman & Goodwin, Hartford, Conn., for defendant Agri-Mark, Inc.

Willis Snell, Washington, D. C., and Adrian Driggs, New York City, Sutherland, Asbill & Brennan, Washington, D. C., for defendant Agway, Inc.

Gerald Hendrick, Ropes & Gray, Boston, Mass., for defendant H. P. Hood, Inc.

Harry G. Shupe, Washington, D. C., for National Association for Milk Marketing Reform.

## OPINION AND ORDER

COFFRIN, District Judge.

The United States of America instituted this antitrust action against Agri-Mark, Inc. (Agri-Mark), Agway, Inc. (Agway), and H. P. Hood, Inc. (Hood). Following settlement negotiations, the parties reached agreement as to the terms of a proposed final judgment. Compliance with the disclosure and response requirements of the Antitrust Procedures and Penalties Act (APPA), 15 U.S.C. § 16(b)–(h), having been achieved, the matter is now before the court for determination of whether entry of this judgment is in the public interest. For the reasons set out below, we conclude that the judgment is in the public interest and should be approved.

### Background

The government filed its complaint on June 26, 1980. Named as defendants are Agri-Mark, the largest dairy farmers' cooperative in New England, Agway, a large agricultural supply cooperative engaged in business throughout the Northeast, and Hood, New England's largest dairy. The complaint charged that a proposed milk supply agreement between Agri-Mark and Hood together with a proposed acquisition of the stock and assets of Hood by Agri-Mark and Agway would violate Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18, by substantially lessening competition or tending to create a monopoly in the marketing of fluid grade milk in the New England area. The government asked that Agri-Mark and Agway be preliminarily and permanently enjoined from entering into the milk supply agreement with or acquiring any interest in Hood.

Following the filing of the complaint, the parties entered into settlement negotiations which resulted in a stipulation on July 16, 1980 withdrawing the government's request for preliminary injunctive relief. Subject to the conditions and limitations of the stipulation, defendants were allowed to proceed with the acquisition and milk supply agreement described in the complaint.

A second stipulation was also filed at this time setting forth the parties' agreement as to the terms of a proposed final judgment settling the action. The proposed judgment would enjoin Agri-Mark from favoring Hood over other dairies in price or other

terms or conditions of milk sales. Agri-Mark would also be enjoined from selectively cutting prices so as to lessen competition and from discriminating against members who leave Agri-Mark in order to compete with it. Hood would be enjoined from hauling milk for or entering into any supply agreement longer than one year with Agri-Mark. Hood and Agri-Mark would further be enjoined from having any common officers, directors, or management, from discussing milk prices except for sales between themselves, and from acquiring any dairy or balancing plant for five years without the consent of the Department of Justice or this court. Pursuant to the proposed judgment, Hood would be required to purchase milk from Hood independents (dairy farmers who shipped milk to Hood at any time in February, 1980, and who, at that time, were not members of a milk marketing or bargaining cooperative) until March 1, 1981. Additionally, Agri-Mark would be required to permit Hood independents to terminate their Agri-Mark marketing agreements during a 20 day grace period.

In accordance with the requirements of the APPA, the proposed judgment and a competitive impact statement were filed with this court and published in the Federal Register on July 31, 1980. A summary of the terms of these documents was thereafter published in *The Washington Star* and *The Burlington Free Press*. Comments from the public relating to the proposed judgment were received by the government. These comments, together with the government's responses thereto, were filed with the court and published in the Federal Register on November 28, 1980. In addition, the National Association for Milk Marketing Reform (NAMMR) filed an *amicus curiae* brief opposing entry of the proposed judgment.

### Discussion

The entry of a consent judgment in a civil antitrust lawsuit brought by the United States is controlled by the terms and conditions of the APPA, 15 U.S.C. § 16(b)–(h). Before the judgment can be entered, we must determine that the entry is in the public interest. 15 U.S.C. § 16(e). Our function in this regard is not to determine whether this is the best possible settlement that could have been obtained, but rather to determine whether the settlement achieved is within the reaches of the public interest. *United States v. Gillette Co.*, 406 F.Supp. 713, 716 (D.Mass.1975); *United States v. Carrols Development Corp.*, 454 F.Supp. 1215, 1222 (N.D.N.Y.1978). Although we are not to act as a "rubber stamp" in approving the settlement, we are instructed to preserve the consent decree as a viable settlement option. *See* S.Rep.No.93–298, 93d Cong., 1st Sess. 6 (1973); H.Rep.No.93–1463, 93d Cong., 2d Sess. 8 (1974), 1974 U.S.Code Cong. & Ad.News 6535, 6538–6539.

In making our determination on the public interest issue, we have broad discretion in selecting the means by which we obtain the necessary information. *See id.*; 15 U.S.C. § 16(f). The expectations of both the House and the Senate committees reporting on the APPA are instructive:

It is not the intent of the Committee to compel a hearing or trial on the public interest issue. It is anticipated that the trial judge will adduce the necessary information through the least time-consuming means possible. Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, this is the approach that should be utilized. Only where it is imperative that the court should resort to calling witnesses for the purpose of eliciting additional facts should it do so.

S.Rep.No.93–298, quoted in H.Rep.No.93–1463.

NAMMR suggests that further proceedings are necessary because the government has not presented the court with sufficient financial projections and market analyses of the proposed settlement and course of action to enable us to make our public interest determination. We disagree. The government has provided the court with a comprehensive competitive impact statement and a detailed response to public comments relating to the proposed judg-

ment as is required by the APPA, 15 U.S.C. §§ 16(b), (d). The government is nowhere required to provide the court with materials which might be necessary or appropriate at a trial on the merits. Furthermore, we are not compelled "to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." *United States v. Gillette*, 406 F.Supp. at 715, quoting from the legislative history of the APPA at 119 Cong.Rec. 24598 (1973). After carefully reviewing the briefs, affidavits and other papers submitted in this matter, including the *amicus* brief filed by NAMMR, we conclude that evidentiary hearings are not necessary and that the proposed consent judgment is in the public interest.

Although the proposed judgment does not achieve the equivalent of the relief originally sought by the government, we are satisfied that the proposal achieves the objectives of the government in bringing this action by ensuring that the transactions initially challenged may be consummated without reducing competition in the New England milk industry.

The court has carefully considered the thirteen third party comments resulting from publication of the proposed final judgment and the government's response thereto.[1] A few of the responses and the reasoning upon which they were predicated were clarified at a status conference held for that purpose on February 23, 1981. It would serve no useful purpose to enumerate the court's inquiries or the discussion concerning them in this opinion but a transcript of the conference proceedings will be made part of the record for the benefit of anyone who desires further information.

The court has given due consideration to the position of NAMMR as elaborated upon

at the status conference. As stated earlier, NAMMR basically seeks to require plaintiff to provide substantive evidence by way of a hearing for the ostensible purpose of assisting the court in better determining whether the proposed judgment is in the public interest. The government concedes that it could probably develop the type of evidence suggested by NAMMR but it would be extremely burdensome and costly to do so.

We conclude, absent even a minimal showing that market projections, statistical compilations and financial analyses would demonstrate significant flaws in the reasoning expressed in the CIS and plaintiff's responses to third party comments, that an evidentiary hearing and the substantial preparation that it would entail would simply delay the entry of final judgment without any commensurate benefit to the court or public. Accordingly, we decline to order such a hearing as NAMMR requests.[2]

For the reasons set forth above, we find that the consent judgment is in the public interest and it is entered this date.[3]

---

1. The third party comments are summarized on pages 10 and 11 of the response of the United States and are also set forth in their entirety as appendix A to the response.

2. As *amicus* and not an intervenor, NAMMR would not be an active participant in a hearing in any event.

3. Paragraph VI, section (c) of the judgment enjoins Hood from refusing to purchase raw milk from any Hood independent producer until March 1, 1981, subject to certain conditions. Although the time for compliance with this section is now past it is not deleted however in order to preserve the judgment in manner and form as originally proposed.