**UNITED STATES of America, Plaintiff,**

v.

**G. HEILEMAN BREWING CO., INC. and Pabst Brewing Company, Defendants.**

Civ. A. No. 82–750.

United States District Court,
D. Delaware.

May 9, 1983.

---

23. *Id.* at 375.

Anthony V. Nanni, Michael H. Byowitz and Judith N. Batty, Attys., U.S. Dept. of Justice, Antitrust Div., Washington, D.C., and Joseph J. Farnan, Jr., U.S. Atty., Wilmington, Del., for plaintiff.

Bruce M. Stargatt of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and Foley & Lardner, Milwaukee, Wis., of counsel, for defendant G. Heileman Brewing Co., Inc.

A. Gilchrist Sparks III of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Sutherland, Asbill & Brennan, Washington, D.C., Michael, Best & Friedrich, Milwaukee, Wis., and Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for defendant Pabst Brewing Co.

Robert K. Payson and Peter Sieglaff of Potter, Anderson & Corroon, Wilmington, Del., and Joseph L. Alioto, Joseph M. Alioto and Gary Elion of Alioto & Alioto, San Francisco, Cal., of counsel, for Paul Kalmanovitz, S&P Co. and General Brewing Co., proposed intervenors.

## OPINION

LATCHUM, Chief Judge.

This antitrust action was brought by the United States on November 22, 1982 against defendants G. Heileman Brewing Company, Inc. ("Heileman"), and Pabst Brewing Company ("Pabst"). At the same time that the complaint was filed, a proposed final consent decree signed by the parties was also filed.

The complaint alleges that Heileman's acquisition, through a cash tender offer, of control over all the assets of Pabst and Olympia Brewing Company ("Olympia"),[1] may substantially lessen competition in the production and sale of beer, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The United States seeks to enjoin Heileman from retaining any interest in any of the breweries or brands of beer owned by Pabst or Olympia other than the Pabst breweries situated in Pabst, Georgia, and Portland, Oregon; the Olympia brewery situated in San Antonio, Texas; and the following brands of beer: Red, White & Blue; Burgermeister; Blitz-Weinhard; Henry Weinhard Private Reserve; Bohemian; Lone Star; Lone Star Light; and Buckhorn (collectively, the "retained assets"). These brands represent total 1981 shipments of 3 million barrels.

The proposed consent decree limits Heileman to the retained assets, which represent only a portion of the total assets of Pabst and Olympia. At the same time, it prevents Heileman from retaining any interest in, or exercising any control over, the remainder of the Pabst and Olympia assets (the "non-retained assets"). As required by the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) ("APPA"), this Court's determination that the proposed Final Judgment is in the public interest is a prerequisite for approving and entering final judgment.

On March 19, 1983, Heileman totally relinquished any ownership interest in Pabst in return for the retained assets specified in the Final Judgment.

Presently before this Court is the motion of Paul Kalmanovitz, S&P Company and General Brewing Company (collectively the "movants") to intervene in this action under the provisions of the APPA and to participate in an evidentiary hearing.

BACKGROUND FACTS

Sometime during 1981 or early 1982, Heileman was considering Pabst as a possible acquisition candidate. However, in May, 1982, the Antitrust Division of the Department of Justice concluded that the merger of Heileman and Pabst would violate Section 7 of the Clayton Act in the nation as a whole and in a section of the United States consisting of the northern portion of the United States.[2]

While the Antitrust Division was reviewing the proposed Heileman/Pabst transaction, Pabst sought to purchase and subsequently acquired 49 percent of the outstanding shares of Olympia. The Antitrust Division declined to challenge the Pabst/Olympia combination under Section 7 of the Clayton Act.[3]

While Pabst's tender offer for Olympia was outstanding, Heileman sought to acquire part of Pabst by entering into an agreement with JMSL Acquiring Corporation ("JMSL"). Pursuant to this agreement, on June 23, 1982, JMSL, a corpora-

---

1. At the time the complaint was filed Pabst owned 49% of the common stock of Olympia and Heileman owned approximately 2% of Olympia.

2. Based on 1981 shipments data, Heileman was the nation's fourth largest brewer with 7.6 percent of total industry shipments. Pabst was the nation's fifth largest brewer with 7.4 percent of total industry shipments. The combination of Heileman and Pabst in the national market would have increased total seller concentration by 112 points, from 1722 to 1834, as measured by the Herfindahl Index. The four-firm concentration ratio of sellers would have increased by 7.4 percentage points, from 72.2 percent to 79.6 percent.

In the northern portion of the United States, the increase in concentration as a result of the

merger, as measured by the Herfindahl Index, would have been substantially greater than in the nation as a whole.

3. Based on 1981 shipments data, the combination melded together the nation's fifth largest brewer (Pabst) with 7.4 percent of total industry shipments and the sixth largest brewer (Olympia) with 3.1 percent of industry shipments. The resulting firm was the nation's fourth largest brewer with 10.5 percent of total industry shipments. Nationally, the combination increased industry seller concentration, as measured by the Herfindahl Index, by 42 points, from 1722 to 1764. It increased the industry four-firm concentration ratio by 2.9 percent from 72.2 percent to 75.1 percent.

tion controlled by certain dissident Pabst stockholders led by Irwin Jacobs (the "Jacobs Group"), commenced a tender offer seeking to acquire a sufficiently large block of stock to give it control of Pabst. If successful, JMSL would have caused Pabst to convey to Heileman the Pabst breweries at Pabst, Georgia, and Newark, New Jersey. Heileman would have also acquired an exclusive license to produce and market all the Pabst brands in a 27-state area, that is, in all states east of the Mississippi River (except Wisconsin, Illinois and Indiana) and in Louisiana, Texas, Arkansas and Oklahoma.

After a detailed review of the JMSL-Heileman proposal, the Antitrust Division concluded that it raised serious competitive problems because the splitting of the Pabst brands inherently created an interdependence between substantial competitors (*i.e.,* Heileman and the JMSL-controlled Pabst), and because a review of the financial structure and business prospects of the surviving Pabst entity led the Antitrust Division to find that its long-term viability was open to serious question. On July 22, 1982, the same day that the Division announced its opposition to the JMSL transaction, this Court issued a preliminary injunction enjoining the JMSL tender offer as a violation of Section 7 of the Clayton Act. JMSL terminated its offer the next day.

The final round in the take-over battles for Pabst began on October 27, 1982 when JMSL commenced a second tender offer for a sufficiently large block of Pabst stock to give it control of the company. At that time, the Jacobs Group and Paul Kalmanovitz controlled JMSL. The Antitrust Division determined not to file a civil antitrust suit challenging JMSL's proposed acquisition of Pabst.[4]

On November 10, 1982, with the second JMSL tender offer pending, Heileman, through its wholly-owned subsidiary, HBC Acquisition Corporation ("HBC"), commenced a tender offer for up to 5.5 million shares of Pabst common stock. This offer contemplated that, following Heileman's acquisition of a controlling interest in Pabst, Heileman would acquire the remaining shares of Pabst in one merger (the "Pabst merger") and Pabst would acquire the remaining 51 percent of the stock of Olympia in another transaction (the "Olympia merger"). Thereupon, Heileman would exchange all of its equity interest in Pabst for the retained assets (the "exchange transaction"). This series of corporate transactions would result in the transfer of the retained assets to Heileman and of the non-retained assets to a separate entity in which Heileman would have no interest.

The Antitrust Division found that Heileman's acquisition of the retained assets would not violate Section 7 of the Clayton Act,[5] but also advised Heileman and Pabst

---

4. The Division treated JMSL's acquisition of Pabst and Olympia as a consolidation of these firms with General Brewing Company, Falstaff Brewing Company and Pearl Brewing Company, the companies controlled by Kalmanovitz. If successful, the second JMSL tender offer would have left Mr. Kalmanovitz with a 50 percent interest in the company owning Pabst and Olympia. The Division also treated Pabst and Olympia as one entity in recognition of the Pabst/Olympia transaction heretofore described.

Under this analysis, in 1981, the JMSL transaction would have combined the nation's fourth largest brewer (Pabst/Olympia) with a national market share of 10.5 percent and the Kalmanovitz companies, collectively the nation's eighth largest brewer, accounting for 2.0 percent of total industry shipments. The resulting combination would have remained the nation's fourth largest brewer with a national market share of 12.5 percent. Nationally, the transaction would have increased total seller concentration, as measured by the Herfindahl Index, by 42 points, from 1764 to 1806. It would have increased the four-firm concentration ratio by 2.0 percent from 75.1 percent to 77.1 percent.

5. Based on 1981 data and treating Pabst and Olympia as a single unit, Pabst/Olympia was the nation's fourth largest brewer with a national market share of 10.5 percent. Heileman was the nation's fifth largest brewer with shipments representing 7.6 percent of the national market. With the contemplated transfer of brands representing 3.0 million barrels, Heileman would become the nation's fourth largest brewer with shipments accounting for 9.3 percent of the national market, and Pabst/Olympia would become the nation's fifth largest brewer with shipments accounting for 8.8 percent of the industry total. Because the pro-

that it had serious concerns about the competitive implications of the proposed transactions if, for any reason, Heileman obtained control of Pabst.[6] The United States then filed its Complaint and proposed Final Judgment in this action on November 22, 1982.

While the Antitrust Division's investigations of the two competing tender offers were proceeding, the Jacobs Group and Mr. Kalmanovitz commenced a private action in this Court against Heileman, Pabst and Olympia. (C.A. No. 82–736.) The complaint in that suit alleged that Heileman's offer and the transaction contemplated thereunder would violate Section 7 of the Clayton Act and Section 1 of the Sherman Act and that the Pabst directors had breached their fiduciary duties by agreeing to sell the retained assets to Heileman. The complaint sought, among other things, to enjoin Heileman from acquiring any Pabst shares pursuant to its offer. On November 24, 1982, this Court denied the motion of the Jacobs Group and Mr. Kalmanovitz for a preliminary injunction against Heileman's offer.

As a result of a settlement agreement among Heileman, Pabst and the Jacobs Group announced on November 26, 1982, the JMSL and Heileman tender offers were withdrawn. In connection with that settlement, HBC commenced a new tender offer for Pabst shares (the "HBC Offer") and the Jacobs Group agreed to tender its Pabst shares to HBC. As subsequently amended, HBC offered to purchase up to 5.6 million Pabst shares.[7]

In response to the HBC Offer, Mr. Kalmanovitz made a competing tender offer to purchase 4,150,000 Pabst shares. Mr. Kalmanovitz also brought another action in this Court against Heileman and Pabst.[8] Mr. Kalmanovitz's complaint in that suit sets forth a variety of claims that are virtually identical to those asserted by Mr. Kalmanovitz and the Jacobs Group against Heileman's earlier tender offer for Pabst. In addition, Mr. Kalmanovitz alleged that Heileman, Pabst and the Jacobs Group had conspired to eliminate bidding for Pabst shares in violation of Section 1 of the Sherman Act. On December 22, 1982, this Court denied Mr. Kalmanovitz's motion for a preliminary injunction with respect to all of his claims. On December 23, 1982, HBC purchased 5.6 million Pabst shares. Mr. Kalmanovitz terminated his offer on December 28, 1982.

Although Mr. Kalmanovitz's motion for a preliminary injunction in C.A. No. 82–797 was denied, his action in this Court is still pending. On January 14, 1983, Mr. Kalmanovitz filed a substantially identical action in the United States District Court for the Northern District of California[9] ("California Court"). On January 17, 1983, a written comment opposing the proposed Final Judgment was submitted to the Department of Justice on Mr. Kalmanovitz's behalf. Two days later, Mr. Kalmanovitz and two of his brewing companies filed the present motion to intervene in this case.

posed transactions contemplated the transfer of barrelage from a larger company, Pabst/Olympia, to a smaller company, Heileman, it produced a modest decrease in the national seller concentration Herfindahl Index of 2 points, from 1764 to 1762. Similarly, the industry four-firm concentration ration is diminished by 1.2 percent, from 75.1 percent to 73.9 percent.

6. Based on 1981 shipments data and treating Pabst and Olympia as a pre-transaction single entity, the acquisition by Heileman of those firms would increase total seller concentration by 163 points, from 1764 to 1927, as measured by the Herfindahl Index. The acquisition would increase the four-firm concentration ratio of sellers by 7.6 percent, from 75.1 percent to 82.7 percent.

7. The same series of transactions contemplated under Heileman's earlier tender offer were also contemplated under the HBC Offer. Subject to a minor modification of the proposed Final Judgment filed with the Court on December 27, 1982, the proposed decree is intended to apply to the HBC Offer.

8. C.A. No. 82–797.

9. Case Action No. C83–0196; this latter case along with another case, entitled Kalmanovitz v. Jacobs et al., Case No. C83–074, originally filed in the Marin County Superior Court and removed to the California Court, was transferred pursuant to 28 U.S.C. § 1404(a) to this Court by order dated April 26, 1983.

The transactions contemplated under the HBC Tender Offer have since been fully completed and carried out. On March 18, 1983, the shareholders of Pabst and Olympia, respectively, approved the Pabst merger and the Olympia merger at special meetings called to consider those transactions. The two mergers and the exchange transaction were consummated the following day. Thus, since March 19, 1983, Heileman has owned the retained assets. Pabst has been an independent company consisting of the non-retained assets and Olympia has been a wholly-owned subsidiary of Pabst.

THE LAW

■ The APPA provides that "[b]efore entering any consent judgment proposed by the United States under this [statute], the court shall determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e). In making that determination, it is not necessary for the Court to decide whether the proffered decree "is the best possible settlement that could have been obtained if, say, the government had bargained harder," for the "court is not settling the case"; instead, it is called upon to determine only "whether the settlement achieved is within the reaches of the public interest." *United States v. Gillette Co.,* 406 F.Supp. 713, 715–16 (D.Mass.1975).

■ The movants seek to intervene and present evidence in this case under the consent decree review procedures of the APPA. They do not contend that they have a *right* to intervene under the APPA or other authority. Instead, they request the Court to exercise its discretion by permitting them to intervene and to present unspecified expert testimony and documentary evidence under the APPA. The statute provides that the Court, in making its determination that the proposed Final Judgment is in the public interest:

> the court may authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a third party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate.

15 U.S.C. § 16(f)(3). Thus, a district court *may* permit third party participation in consent decree proceedings where this would assist the court in making its public interest determination. Under the APPA, would-be intervenors must show that they meet the eligibility requirements of the Federal Rules of Civil Procedure, which are set forth in Rule 24.

Here the movants have not shown that they are eligible to intervene under the Federal Rules of Civil Procedure. Movants also have made no showing that the expert testimony and documentary evidence they propose to adduce through third-party participation is necessary or desirable to assist the Court in making its public interest ruling; nor have they shown that the APPA's third-party comment procedure is an inadequate means to apprise the Court of their complaints about the proposed Final Judgment.

I. *Intervention Under Rule 24, Fed.R. Civ.P.*

■ The APPA prescribes the circumstances under which intervention in consent decree review proceedings may occur. The statute expressly provides that a court may, but is not required, to permit intervention pursuant to the Federal Rules of Civil Procedure. APPA, § 2(f)(3), 15 U.S.C. § 16(f)(3). The APPA confers no absolute right to intervene in the review process; rather, intervention is committed entirely to the discretion of the court. *United States v. American Telephone and Telegraph Company,* 1982–2 Trade Cas. (CCH) ¶ 64,726 (D.D.C. April 8, 1982). Furthermore, the statute provides that the court's discretion should be exercised to permit intervention only for applicants who meet the eligibility requirements under the Federal Rules.

Although the Federal Rules divide intervention into two categories, referred to as intervention as of right and permissive in-

tervention, in cases under the APPA no third-party participation is of *right.* The various means of gathering information specified under the APPA "were to be regarded as permissive." *Id.* at 71,524.

While applicants can qualify for intervention under the Federal Rules in four separate ways, two of these paths to intervention, Rule 24(a)(1) and (b)(1), are inapplicable on their face in consent decree review proceedings. Rule 24(a)(1) provides for intervention when a statute of the United States confers an unconditional right to intervene, and Rule 24(b)(1) when such a statute confers a conditional right to intervene. The APPA does not confer any *right* to intervene, conditional or otherwise. Indeed, the only provision of the APPA that even mentions intervention is Section 2(f)(3), 15 U.S.C. § 16(f)(3), which as noted above provides only that a court *may* allow intervention. It does not provide for any conditions under which a court is required to grant intervention. The movants do not contend otherwise and the courts have so ruled. *United States v. American Telephone and Telegraph Company, supra,* at 71,524; *United States v. Associated Milk Producers, Inc.,* 394 F.Supp. 29, 41 (W.D.Mo. 1975), *aff'd,* 534 F.2d 113 (8th Cir.), *cert. denied sub nom. National Farmers Organization, Inc. v. United States,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976).

Likewise, the movants do not qualify under the other two grounds for intervention provided by Rule 24(a)(2) and (b)(2), Fed.R.Civ.P. Indeed, Rule 24(a)(2) provides for intervention:

> when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2). The movants do not meet this Rule's requirement of an "interest relating to the . . . transaction" which the United States, Heileman and Pabst are not adequately representing. Nor are the mov-

ants able to show that they meet the Rule's additional requirement that "the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest."

In challenging the proposed Final Judgment under Section 7 of the Clayton Act, the movants seek to intervene to promote the general public interest in effective competition in the beer industry. In this regard, the movants stand as any other member of the public. They are not entitled to intervene simply to advance their own ideas of what the public interest requires. In federal antitrust litigation, it is the United States, not private parties, which "must alone speak for the public interest." *Buckeye Coal & Railway Co. v. Hocking Valley Railway Co.,* 269 U.S. 42, 49, 46 S.Ct. 61, 63, 70 L.Ed. 155 (1925). Congress has vested in the United States the duty to protect the public interest. Any disagreement with the wisdom of the United States' decision concerning the adequacy of proposed relief does not indicate inadequate representation of the public interest. For these reasons, the courts have consistently denied intervention to private parties whose views about the proper terms for an antitrust settlement differed from those of the United States. *E.g., United States v. International Telephone and Telegraph Corporation,* 349 F.Supp. 22 (D.Conn.1972), *aff'd mem sub nom. Nader v. United States,* 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582 (1973); *United States v. Automobile Manufacturers Association,* 307 F.Supp. 617 (C.D. Cal.1969), *aff'd sub nom. City of New York v. United States,* 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970) (per curiam); *United States v. Blue Chip Stamp Company,* 272 F.Supp. 432, 438 (C.D.Cal.1967), *aff'd sub nom. Thrifty Shoppers Script Company v. United States,* 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968) (per curiam).

The Eighth Circuit articulated the governing standard for intervention under Rule 24(a)(2) in government antitrust cases in *United States v. Associated Milk Producers, Inc.,* 534 F.2d 113 (8th Cir.1976), *cert. denied sub nom. National Farmers Organiza-*

*tion, Inc. v. United States,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1977). In that case, a competitor of the defendant sought to intervene claiming that the relief provided under the proposed consent decree was inadequate. The Court of Appeals denied intervention, stating that " 'bad faith or malfeasance on the part of the government' in negotiating or accepting a consent decree must be shown before intervention will be allowed." 534 F.2d at 117, *quoting Sam Fox Publishing Company v. United States,* 366 U.S. 683, 689, 81 S.Ct. 1309, 1313, 6 L.Ed.2d 604 (1961); *accord United States v. Hartford-Empire Company,* 573 F.2d 1 (6th Cir.1978); *United States v. The Stroh Brewing Company,* 1982–2 Trade Cas. (CCH) ¶ 64,804 at 71,960 (D.D.C. June 4, 1982). In the present case, the movants have made no claim—let alone any showing—of bad faith or malfeasance on the part of the United States in agreeing to the proposed consent decree.

The movants are also unable to show, as required under Rule 24(a)(2), that entry of the proposed Final Judgment will "impair or impede" their ability to protect the concerns they seek to assert by intervention in this case. The movants are currently prosecuting challenges to the transactions accomplished under the proposed Final Judgment before this Court in several different actions. In those actions, the movants have alleged numerous claims against Heileman, Pabst and the Jacobs Group. Their attacks encompass a wide range of theories, including Section 7 of the Clayton Act, Section 1 of the Sherman Act, by commercial bribery, discriminatory pricing of Pabst stock and interference with contractual relations and breach of fiduciary duty. Those allegations appear to be the same ones that the movants wish to assert in this case through intervention. Because the proposed final decree would have no *prima facie* effect in their private suits, its entry would in no way "impair or impede" movants' ability to protect their interests. *United States v. Associated Milk Producers, Inc., supra,* 534 F.2d at 116 n. 3; *see United States v. Carrols Development Corporation,* 454 F.Supp. 1215, 1220 (N.D.N.Y.1978).

■ Turning now to Rule 24(b)(2), it provides for intervention:

> when an applicant's claim or defense and the main action have a question of law and fact in common . . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed.R.Civ.P. 24(b)(2). Thus, applicants seeking to intervene under Rule 24(b)(2) must show that their claim and the main action raise common questions of fact and law. Would-be intervenors must also show that intervention would not unduly delay or prejudice the original parties.

In light of the significant differences between the allegations of the government's complaint in this action and those advanced in support of the motion to intervene, movants are in no position to contend that their claims and the government's present common questions of law or fact under Rule 24(b)(2). The United States in this action alleges a violation of Section 7 of the Clayton Act based on increased concentration in a relevant market which would arise if Heileman controlled all of the assets of Pabst and Olympia, but *not* if Heileman is limited to the retained assets. The movants seek, however, to intervene to raise issues of commercial bribery, discriminating pricing of Pabst stock, interference with contractual relations and breach of fiduciary duty to Pabst's shareholders. The focus of these claims is the relative merits of the HBC Tender Offer *vis-a-vis* Mr. Kalmanovitz's tender offer, as well as the business merits of Pabst management's decisions to sell the retained assets to Heileman and to settle with the Jacobs Group. Such issues are totally irrelevant to conventional antitrust analysis, as reflected in existing precedent, upon which the government's complaint in this case is based, and they present no common questions of fact or law. Furthermore, because these extraneous issues are not part of the government's case, intervention will "unnecessarily delay [and] prejudice the adjudication of the rights of

the original parties." Fed.R.Civ.P. 24(b). In such circumstances, courts have consistently denied intervention under Rule 24(b)(2) by private parties in government antitrust litigation. *E.g., United States v. Carrols Development Corporation, supra,* 454 F.Supp. at 1221; *United States v. Blue Chip Stamp Company, supra,* 272 F.Supp. at 439.

Moreover, the movants fail to support their claim that the proposed Final Judgment is anticompetitive. As already noted, there has been no showing of bad faith or malfeasance by the United States tainting the process leading to the proposed final judgment. Under such circumstances, it is inappropriate for a court through third-party intervention to force upon the United States the trial of an antitrust case it has already settled. *United States v. The Stroh Brewery Company,* 1982–2 Trade Cas. (CCH) ¶ 64,804 (D.D.C. June 4, 1982). In the *Stroh Brewery* case, the court denied Heileman's request for intervention under Rule 24(b)(2) because, in the absence of a showing of bad faith or malfeasance, the potential for unwarranted delay and prejudice to the original parties implicit in third-party participation clearly outweighed any benefit that might have accrued from it. *Id.* at 71,960; *accord United States v. The Stroh Brewery Company,* 1982–2 Trade Cas. (CCH) ¶ 64,782 at 71,830 (D.D.C. June 8, 1982) (intervention motion by various brewery worker unions denied).

Accordingly, this Court concludes that the movants do not qualify for intervention under any of the provisions of Rule 24 and thus have no grounds for intervening in this action.

II. *Evidentiary Hearing Unnecessary To Assist Court In Determining Whether Final Judgment Is In Public Interest*

■ The instant antitrust action was brought by the government to prevent a potential source of competitive concern raised by the HBC Tender Offer and the transactions contemplated thereunder. The government believed that by limiting Heile-man to the retained assets, the proposed final decree would eliminate the acquisition's anticompetitive effects.

The movants, however, seek to present evidence to support their claim that the relief provided under the proposed judgment will not prevent anticompetitive effects from occurring as a result of the HBC Tender Offer. They also want to broaden the Court's inquiry beyond the adequacy of the relief provided by introducing additional evidence attacking the business merits and fairness of the transactions to the minority Pabst shareholders of the HBC Offer, the settlement with the Jacobs Group, the Pabst merger and the exchange transaction.

Before requesting a full-blown evidentiary hearing, the movants are required to show that such a hearing is necessary or desirable to assist the Court in making its public interest determination. However, they have failed to make any such showing. They have not identified the experts from whom they would elicit testimony, nor have they specified what documents they would seek to introduce at a hearing. Instead, they are content to rely on bare allegations that do not in reality call the adequacy of the proposed relief into question. Furthermore, the movants have not explained why this Court should hold an evidentiary hearing on their other claims when those same issues have already been raised by movants through the APPA's third-party comment procedure.

First, the movants have not expressly disputed the traditional antitrust analysis that forms the basis of the government's cases and they do not urge this Court to permit their participation to challenge Heileman's acquisition of the retained assets on conventional antitrust grounds. Indeed, they do not appear to be in a position to claim that the combined market shares and market power that would be produced by Heileman's acquisition of the retained assets may violate Section 7 of the Clayton Act. Mr. Kalmanovitz's tender offer for

Pabst would have produced a substantially larger increase in industry concentration.[10]

What movants have argued in their brief is that the proposed Final Judgment would not effectively prevent Heileman from exercising control over all the assets of Pabst and Olympia. This contention, however, has by time gone by the board. With the consummation of the exchange transaction on March 19, 1983, Heileman has transferred all of its Pabst and Olympia stock to Pabst in exchange for the retained assets, and Pabst again has become an independent company beyond Heileman's control. At that point, any previous concern about the adequacy of the proposed judgment in precluding Heileman from exercising any control over, or retaining any interest in, the non-retained assets has become moot.

Next, the movants contend that, with the retained assets transferred to Heileman, the surviving Pabst/Olympia firm will not be a viable competitor in the brewing industry. This result, movants contend, will be the elimination of Pabst/Olympia as a competitor, the very danger the judgment was designed to guard against.

However, during this Court's consideration of Heileman's initial tender offer for Pabst through HBC in November, 1982, the Jacobs Group and Mr. Kalmanovitz made the very same viability argument. At that time, the Jacobs-Kalmanovitz group submitted detailed financial and competitive analyses. Yet, the Court was unable to find the surviving Pabst/Olympia firm nonviable as it had done in the JMSL-Heileman earlier transaction, and instead denied the Jacobs-Kalmanovitz motion for a preliminary injunction under Section 7. In now seeking to reopen this issue, the movants have produced no new financial or competitive analyses. In fact, they have produced no evidence at all. Although they request leave of the Court to present expert testimony at an evidentiary hearing, the movants offer no affidavits from such witnesses. They appear content to rely upon spec-

ulation and a few observations about the value and condition of some of the assets to be transferred or retained. A stronger showing must be made by a third party requesting a court to engage in a full-scale evidentiary hearing on an issue that it has preliminarily resolved.

Because there are significant differences between the surviving Pabst/Olympia firms in the HBC Offer and the JMSL-Heileman proposal, the movants' reliance on this Court's decision and the Antitrust Division's action regarding the JMSL-Heileman transaction is misplaced. In the JMSL deal, the splitting of the Pabst brands inherently created an interdependence between the JMSL-controlled Pabst and Heileman when those firms were to be substantial competitors in the western portion of the United States. Pabst also would have given up the right to sell its brands in the country's eastern half, thereby consigning itself to the status of a regional brewer forever. By the very nature of the asset transfer, the splitting of the Pabst brands, Heileman would have been the only logical buyer if the JMSL-controlled Pabst failed. On the other hand, under the present arrangement, there is no splitting of brands and, thus, no inherent interdependence between Pabst/Olympia and Heileman. Pabst/Olympia remains a national brewing company outside of Heileman's control. Although lacking breweries in the Southeast and Southwest, it will not be precluded from selling its brands, and buying or building production capacity, in those areas. If it should fail, there are any number of logical buyers for its brands and breweries, including Mr. Kalmanovitz. The proposed Final Judgment clearly ensures that Heileman will not be among them.

Finally, the movants have made no showing that they could not adequately communicate their views and complaints concerning the proposed Final Judgment through the third party comment procedures under the APPA. The APPA requires newspaper and Federal Register publication of proposed final judgments by the United States

---

**10.** *Compare* n. 5 (Heileman's acquisition of retained assets) *with* n. 4 (Jacobs-Kalmanovitz acquisition of Pabst/Olympia).

after the consent decree has been filed with the Court. The statute further requires that the United States file a competitive impact statement fully discussing the provisions of the decree and the reasons for the government's decision to enter into a settlement on such terms. The statute then provides for a 60–day period in which third parties may submit their comments on the proposed judgment to the Department of Justice. The Justice Department is then required to consider and respond to all comments received. Thereafter, the comments and responses must be published in the Federal Register and filed with the Court. Only after the Court has had an opportunity to review the comments and responses are the parties entitled to request a determination that the proposed Final Judgment is in the public interest.

In the present case, the United States has complied completely with the APPA by publishing notice of the proposed Final Judgment in the Federal Register, The Wilmington News-Journal and The Washington Post. A Competitive Impact Statement was filed with the Court, together with the complaint and proposed Final Judgment. Before the 60-day comment period expired, only one comment, from Mr. Kalmanovitz, was received. The United States' response to Mr. Kalmanovitz's comment was filed with the Court on March 30, 1983, and was thereafter published in the Federal Register on April 12, 1983. 48 Fed. Reg. 15,749–50 (April 12, 1983).

Thus, movants' views concerning the proposed Final Judgment already have been submitted to the Department of Justice in the form of a comment. Other than the abovementioned Section 7 allegations, which are not articulated in the comment, it contains the very same charges upon the proposed Final Judgment that underlie the instant request for third-party participation. The movants do not explain why multiple consideration of these views is necessary.

Under the APPA, courts have rejected requests for third-party participation in the absence of a showing that the statute's comment procedure is inadequate for evaluation of a complainant's views. For exam-

ple, in the government's monopolization case against AT&T, Judge Greene ruled:

> Whatever may be the right to intervene in other circumstances, it is plain that under the Tunney Act ... intervention and the purposes for which intervention will be allowed are strictly discretionary with the public interest court. Not only would any other rule render a public interest proceeding completely unmanageable, but the comment procedures, together with subsequent public interest proceedings, provide ample protection for all legitimate interests.

*United States v. American Telephone and Telegraph Company,* 1982–1 Trade Cas. (CCH) ¶ 64,522 at 72,899 (D.D.C. February 5, 1982); *accord United States v. The Stroh Brewery Company,* 1982–2 Trade Cas. (CCH) ¶ 64,782 at 71,829 (D.D.C. June 8, 1982). Following this preference for the comment procedure, other courts have held that " 'a plenary evidentiary hearing [pursuant to 15 U.S.C. § 16(f)(1) and (3) ] is neither necessary nor appropriate' " for a public interest determination under the APPA. *United States v. National Broadcasting Company, Inc.,* 449 F.Supp. 1127, 1143 (C.D.Cal.1978) (*quoting United States v. Gillette, supra,* 406 F.Supp. at 35).

This preference for the comment procedure over more burdensome forms of third-party participation also is clearly shown by the legislative history of the APPA. Congress expected that the district court would "adduce the necessary information through the least complicated and least time-consuming means possible." S.Rep. No. 298, 93d Cong., 1st Sess. 6–7 (1973); H.R.Rep. No. 1463, 93d Cong., 2d Sess. 8 (1974) U.S. Code Cong. & Admin.News 1974, p. 6535; 119 Cong.Rec. 24598–24599 (1973) (Remarks of Sen. Tunney); 120 Cong.Rec. 36343–36344 (1974) (Remarks of Rep. Barbara Jordan); *accord* Hearings on S. 782 before the Subcomm. Monopolies and Commercial Law of the House Comm. on the Judiciary, 93d Cong., 1st Sess. 67 (1973). Hence, the legislative history reveals that the main purpose of the bill was "to encourage additional comments and response by more adequate notice to the public," and not to invite intervention with all of the attendant prob-

lems, complexities and delays that such participation would inevitably involve. S.Rep. No. 298, *supra*, at 5. According to the statute's chief sponsor, Senator John Tunney, the APPA's proponents did "not seek to open the floodgates to litigation, nor has anyone argued that the bill, in its final version and as it was endorsed by all members of the Judiciary Committee would do so." 119 Cong.Rec. 24599 (1973).

In this case, there is simply no reason why the movants could not have fully apprised the Court of all of their concerns in their comment on the proposed Final Judgment. In any event, the movants appeared to have made all the comments they wished. In view of this, the movants' request for an evidentiary hearing, on the issues discussed in their comments and raised in other pending litigation in this Court, is unnecessary and inappropriate in this action.

Accordingly, the movants' motion to intervene in this action for the purpose of holding a full evidentiary hearing will be denied and an order to this effect will be so entered.