UNITED STATES of America, Plaintiff,

v.

MICROSOFT CORPORATION, Defendant.

Civ. A. No. 94–1564.

United States District Court, District of Columbia.

Feb. 14, 1995.

Anne K. Bingaman, U.S. Dept. of Justice, Civil Div., Donald J. Russell, U.S. Dept. of Justice, Antitrust Div., Washington, DC, for plaintiff.

James R. Weiss, Preston, Gates, Ellis & Rouvelas Meeds, Washington, DC, Richard J. Urowsky, Steven L. Holley, Sullivan & Cromwell, New York City, William H. Neukom, Microsoft Corp., Law Dept., Redmond, WA, for defendant.

Gary Leland Reback, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Doe parties.

Jeffrey Steven Jacobovitz, Jacobovitz, English, & Smith, Washington, DC, for I.D.E. Corp.

## MEMORANDUM OPINION [1]

SPORKIN, District Judge.

The issue before this Court is whether the entry of a proposed antitrust consent decree between Microsoft Corporation and the United States is in "the public interest." [2] Microsoft is the world's largest developer of computer software. On July 15, 1994, the Government filed a complaint charging Microsoft with violating Sections 1 and 2 of the Sherman Anti–Trust Act. 15 U.S.C. §§ 1–7 (1973). On the same day the parties filed a proposed consent judgment.[3]

### I. Background

The Government filed the complaint and proposed judgment after a four-year investigation of Microsoft. The Federal Trade Commission ("FTC") initiated the investigation in 1990. According to Microsoft, but not confirmed by the Government, the FTC considered a wide range of practices including: (1) that Microsoft gave its developers of applications software information about its operating systems software before providing it to other applications developers; (2) that Microsoft announced that it was developing a non-existent version of operating software to dissuade Original Equipment Manufacturers ("OEMs") from leasing a competitor's operating system; (3) that Microsoft required OEMs that licensed its operating system software also to license Microsoft applications; and (4) that Microsoft licensed its operating systems to OEMs on a per processor basis.[4] Microsoft asserts that before the FTC investigation was completed, it was expanded to include every aspect of Microsoft's business.[5]

There was never a majority vote among the FTC commissioners to file an administrative complaint against Microsoft. In late 1993, after a 2–2 deadlock by the commissioners, no administrative action was filed, and the FTC suspended its investigation of Microsoft.

Following the suspension of the FTC investigation, Assistant Attorney General Bin-

---

1. The findings and discussion contained in this opinion are for the purposes of this opinion only and will have no bearing on or play any role in any litigation that might follow this proceeding.

2. 15 U.S.C. § 16(e) (Supp.1994) (Tunney Act).

3. The Court has held three hearings on the proposed consent decree—(1) a status call on September 29, 1994; (2) a status call on November 2, 1994; and (3) a final hearing on January 20, 1995.

4. Per processor licenses, applications and operating systems software are all defined below.

5. This would include operating systems software, applications software, and computer peripherals.

gaman, the head of the Antitrust Division of the Department of Justice, decided to revive the investigation. In June, 1994 Microsoft and the Department of Justice initiated settlement negotiations. Approximately a month later the parties came to agreement and filed a proposed judgment with the Court.[6]

## II. The Complaint

The complaint charges that Microsoft violated Sections 1 and 2 of the Sherman Anti–Trust Act. 15 U.S.C. §§ 1–7. The primary allegations in the complaint concern licensing agreements between Microsoft and OEMs of personal computers ("PCs"). The complaint also addresses provisions of non-disclosure agreements ("NDAs") between Microsoft and other developers of applications software, known as independent software developers ("ISVs"). The complaint narrowly tailors the relevant product market to the market for certain operating systems software for x86 microprocessors. The geographic market is not limited.

In order to understand the complaint, one must understand something about computers, microprocessors, and operations and applications software. A microprocessor is the "brain" of the computer. The x86 microprocessor, or chip, runs IBM and IBM-clone PCs. These chips are primarily, but not exclusively, made by Intel.[7] Operating systems software acts as the central nervous system for a personal computer, linking up the keyboard, monitor, disk drive and other components. Applications software enables the PC user to perform a variety of tasks including word processing and database management. Applications software operates on top of the PC's operating system and must be designed to function with that operating system. As a result, ISVs who design applications software need information about an operating system's codes in order to design their software. Microsoft designs both operating systems (e.g., MS–DOS) and applications (e.g., Microsoft Word, a word processing program).

Microsoft has a monopoly on the market for PC operating systems. Microsoft's share of the operating systems market identified in the complaint is consistently well above 70%.[8] According to Microsoft's 1993 Annual Report, as of June 30, 1993, 120 million PCs ran on Microsoft's MS–DOS. Microsoft also developed and sells Windows, a sophisticated operating system that runs on top of MS–DOS or a similar operating system. Windows allows a PC user to run more than one application at a time and shift between them. Windows is known as a "graphical user interface." Approximately 50 million PCs now use Windows. Microsoft generally does not sell its operating systems directly to consumers. Instead, it licenses its operating systems to OEMs for inclusion in the PCs they make.[9]

Microsoft, the Justice Department, and a number of competitors who oppose the entry of the decree all agree that it is very difficult to enter the operating systems market. There are two main reasons for this, each of which reinforces the other. First, consumers do not want to buy PCs with an operating system that does not already have a large installed base because of their concern that there will not be a wide range of applications software available for that operating system. The second, complementary reason why there are large barriers to entry into the operating systems market is that ISVs do not want to spend time and money developing applications for operating systems that do not have a large installed base. They perceive that demand for that software will be low. As a result, OEMs have little incentive

---

**6.** The Justice·Department cooperated with the Directorate–General IV of the European Commission ("DG IV"), the European Union's antitrust enforcement authority. Microsoft has consented with the DG IV to comply with provisions virtually identical to those in the consent decree presently before the Court.

**7.** The 486 and Pentium chips are examples of x86 microprocessors.

**8.** Apple computers do not run on x86 microprocessors and utilize Apple's own proprietary operating system.

**9.** In the first half of 1994, 80% of Windows units sold by Microsoft were through OEMs.

to license an operating system that does not have a large installed base and include it in their PCs.

In addition to these "natural" barriers to entry, the complaint identifies Microsoft's use of per processor licenses and long term commitments as "exclusionary and anti-competitive contract terms to maintain its monopoly." A per processor license means that Microsoft licenses an operating system to an OEM which pays a royalty to Microsoft for each PC sold regardless of whether a Microsoft operating system is included in that PC. In other words, under a per processor license, if an OEM sells some PCs with a competitor's operating system installed (e.g., IBM's OS/2), and others with MS–DOS installed, the OEM would pay Microsoft royalties for all PCs sold. In effect, the OEM pays twice every time it sells a PC with a non-Microsoft operating system—once to the company that licensed the operating system to the OEM and once to Microsoft. The complaint charges that per processor licenses discourage OEMs from licensing competing operating systems and/or cause OEMs to raise the price for PCs with a competing operating system to recoup the fee paid to Microsoft.

The complaint further alleges that Microsoft's use of long-term licensing agreements with or without minimum commitments, and the rolling over of unused commitments unreasonably extended some licensing agreements with Microsoft. These practices allegedly foreclosed OEMs from licensing operating systems from Microsoft's competitors.

The other anticompetitive practice cited in the complaint is the structure of Microsoft's non-disclosure agreements ("NDAs") with ISVs during the development of its new Windows operating system.[10] ISVs work with Microsoft during the development and testing of new operating systems so they can produce applications that run with that operating system and release them around the time the operating system is released. This collaboration benefits Microsoft in two ways. First, Microsoft receives input from the ISVs on how to improve the operating system. Second, a new operating system is more attractive to consumers if there are compatible applications programs immediately available. In order to protect confidential information about its new software, Microsoft requires ISVs to sign NDAs in order to obtain product information.

The complaint alleges that the recent NDAs Microsoft has executed with ISVs are overly restrictive and anti-competitive. The Government alleges that the NDAs not only legitimately protect against the disclosure of confidential information to competing developers of operating systems but also discourage ISVs from developing their own competing operating systems and/or from developing applications for competing operating systems.

In sum, the Government alleges that the practices outlined above deprive competitors of substantial opportunities to license their operating systems to OEMs, preventing them from developing a large installed base. This discourages both ISVs from designing software for competing operating systems and consumers from buying PCs with these competing operating systems. These practices also harm consumers by limiting the variety of available operating systems and raising the prices for non-Microsoft operating systems.

Based on the allegations in the complaint, the Government sought the following relief:

(1) That the Court adjudge and decree that Microsoft has monopolized the interstate trade and commerce in the market for PC operating systems in violation of Section 2 of the Sherman Act.

(2) That the Court adjudge and decree that Microsoft has entered into unlawful contracts and combinations which unreasonably restrain the trade in interstate commerce in PC operating systems, in violation of Section 1 of the Sherman Act.

(3) That Microsoft and all persons, firms and corporations acting on its behalf and

**10.** The newest version of Windows is scheduled for release sometime in 1995 and is code-named Chicago.

under its direction or control be permanently enjoined from engaging in, carrying out, renewing or attempting to engage, carry out or renew, any contracts, agreements, practices, or understandings in violation of the Sherman Act.

(4) That plaintiff have such other relief that the Court may consider necessary or appropriate to restore competitive conditions in the markets affected by Microsoft's unlawful conduct.

### III. The Proposed Decree

The proposed decree negotiated and entered into by the parties is significantly and substantially narrower than the requests contained in the prayer for relief in the complaint. The consent decree limits certain of Microsoft's contract and NDA practices. The prohibitions concern licensing agreements and NDAs for certain operating systems software; operating systems software for workstations are not covered. The decree does not address any of Microsoft's applications software.

The decree enjoins Microsoft from entering into any licensing agreement longer than one year, though OEMs may at their discretion include in the licensing agreement a one year option to renew. Microsoft can impose no penalty or charge on an OEM for its choice not to renew the licensing agreement, nor can it require an OEM to commit not to license a competitor's operating system.

Microsoft may only license the operating systems covered by the decree on a per copy basis, with one exception.[11] Microsoft cannot include minimum commitments in its covered licensing agreements. The agreements cannot be structured so that the OEM pays royalties for including MS–DOS in a fixed number of PCs, whether or not the OEM actually sells that number of PCs with a Microsoft operating system included.

The decree restricts the scope of the NDAs that Microsoft may negotiate with ISVs. Microsoft cannot enter into an NDA whose duration extends beyond, (i) commercial release of the operating system, (ii) an earlier public disclosure by Microsoft, or (iii) one year from the date of the disclosure of information covered by the NDA to a person subject to the NDA, whichever comes first. The decree also prohibits the use of NDAs that would prevent persons covered by that NDA from developing applications for competing operating systems unless the application entailed use of proprietary Microsoft information.

The decree explicitly states that it does not constitute "any evidence or admission by any party with respect to any issue of fact or law." Indeed, Microsoft has denied in its submissions to the Court that any of the allegations set forth in the complaint constitute violations of the antitrust laws.[12]

### IV. Motions To Participate

Before addressing the question of whether the proposed decree is in the public interest, the Court must decide whether to approve three opposed motions to participate in this Tunney Act proceeding. I.D.E. Corporation ("IDEA") has moved to intervene under Fed. R.Civ.P. 24. Anonymous persons, represented by Gary Reback of the law firm of Wilson, Sonsini, Goodrich & Rosati ("Wilson, Sonsini"), have made a motion to file an amicus curiae memorandum in opposition to the proposed final judgment. The Computer & Communications Industry Association ("CCIA") has moved to intervene, or in the alternative, moved to participate as amicus curiae.

### IV.A. Tunney Act—Participation by Interested Persons

Section 16(f) of the Tunney Act gives the Court wide latitude to gather relevant infor-

---

**11.** This exception allows for certain Per System Licenses. A per system license means a license for a particular system or model. The decree allows OEMs to designate identical machines containing different operating systems as distinct systems. This is intended to prevent OEMs from paying royalties to Microsoft for all the computers of a certain system even if some do not include a Microsoft operating system.

**12.** Entry of decrees containing denials by the defendant of the allegations in the complaint are not favored in other government agencies. See 17 C.F.R. § 202.5(e) (1994) (Securities and Exchange Commission).

mation to make its public interest determination. In order to exercise properly its independent role as mandated by Congress, the Court must ensure that it is adequately informed about the intricacies and complexities of the industry affected by the consent decree.[13] Section 16(f)(3) specifically empowers the Court to gather relevant information by means of authorizing intervention and amicus curiae participation:

> (f) In making its determination under subsection (e) of this section, the court may—
>
> (3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate.

§ 16(f)(3).

The Act also encourages participation by interested persons by setting forth a procedure for written public comments on the proposed consent decree. § 16(b). The United States is required to publish in the *Federal Register* the proposed consent decree as well as a competitive impact statement. *Id.* The public has 60 days to submit written comments relating to the consent decree. The United States is required to file such comments with the District Court and publish such comments in the *Federal Register.* *Id.* At the expiration of the 60 day period, the United States must file a response with the Court and publish such response in the *Federal Register.* § 16(d).

In Senate hearings before the Subcommittee on Antitrust and Monopoly, Judge J. Skelly Wright, U.S. Court of Appeals for the District of Columbia Circuit, emphasized the vital role of participation in the consent decree approval process by outside persons:

> The Antitrust Division of the Department of Justice, while no doubt among the most competent and dedicated groups of professionals in Government service, nevertheless is made up of human beings and, unfortunately, human beings occasionally make mistakes.
>
> In approving a particular decree, the Justice Department attorneys may overlook certain issues, ignore certain concerns, or misunderstand certain facts. The participation of additional interested parties in the consent decree approval process helps to correct these oversights.

Senate Hearings, at 146.

Only five public comments were received pursuant to the procedures outlined in § 16(b).[14] These public comments did not provide much enlightenment about the proposed settlement.

---

**13.** The Tunney Act envisioned that the courts were to be an "independent force" rather than a "rubber stamp in reviewing consent decrees." *Antitrust Procedures and Penalties Act: Hearings on S.782 and S.1088 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary,* 93d Cong., 1st Sess. 1 (1973) [hereinafter "Senate Hearings"] (statement of Sen. Tunney).

**14.** The law firm of Chan & Jodziewicz submitted a comment on behalf of a number of small computer companies. The comment charged that Microsoft violated copyright laws by not allowing purchasers of MS–DOS to resell it in any manner they choose. In addition, the comment charged that Microsoft engaged in illegal tying by leasing MS–DOS to OEMs and not selling it to the public. The basis of the claim that this is illegal is that Microsoft "ties" the purchase of MS–DOS to the purchase of a PC.

Micro Systems Option commented that Microsoft's inclusion of a graphics feature in its operating systems would reduce demand for Micro Systems own product, which performs similar functions.

Anthony Martin commented that Microsoft had begun to engage in new anticompetitive conduct, specifically pressuring software suppliers to switch from old versions of Windows to the next version to be released. Mr. Martin suggested that the Department of Justice should reopen its investigation.

IDE Corporation, an OEM which has a licensing agreement with Microsoft, commented that the decree should have forced Microsoft to repay certain royalties received from IDE in an agreement of a type prospectively forbidden in the decree.

Finally, J. Adam Burden commented that the Government should have brought no action at all against Microsoft, whose success is attributable to good products.

Since receipt of these public comments, the Court has received motions to intervene and appear as amici in the proceeding.

### IV.B.  Timeliness of Motions to Participate

■ Both the Justice Department and Microsoft argue that the motions to intervene and the motion to appear as amicus curiae (hereinafter "motions to participate") are untimely because they were served three months after the close of the Tunney Act's 60 day public comment period pursuant to § 16(b), and were served only days before the scheduled final hearing held on January 20, 1995.

These motions to participate were brought under § 16(f) which specifically gives the court a wide variety of alternatives to gather information necessary to its public interest determination. Section 16(f) and § 16(b), while complementing each other in the sense that they both help to insure that the proposed consent decree receives a thorough public airing, are wholly separate provisions.

The Justice Department and Microsoft suggest that granting the "late" motions to participate would be prejudicial because it would delay the approval process. The Court is well-aware that Congress directed that the public interest inquiry should be conducted in "the least complicated and least time-consuming means possible." S.Rep. No. 296, 93d Cong., 1st Sess. 6 (1973) [hereinafter "S.Rep."]; accord H.R.Rep. No. 1463, 93d Cong., 2d Sess. at 12 (1974) [hereinafter "H.R.Rep."] "Extended proceedings" might "have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong.Rec. 24,598 (1973) (statement of Sen. Tunney).

But the Court cannot sacrifice the thoroughness of its inquiry, and hence, the validity of its determination that the consent decree is in the public interest in order to increase the speed with which the decree is approved. Judge J. Skelly Wright aptly recognized that in cases of national import the Tunney Act process would be turned on its head if the Court considered the speed of review to be more important than the accuracy of review:

> [I]n many cases, I would think, and have seen, no opposition filed, where the case is of great national importance, then time should be taken—court's time and counsels' time should be taken to study the decree, to get information from the public concerning the ramification of the decree, the anticipated results of the decree and, in my judgment, this time is well spent, even though it may take day, even though it might take weeks; it could have a trial that would last months and months.
>
> So, to suggest that S. 782 will not require judicial time and counsel time would be misleading. In important cases, S. 782 would require judicial time, necessarily so, and I believe rightfully so.

Senate Hearings, at 151.

The Court is simply not willing to find that because the motions were made days before the scheduled final hearing on January 20, 1995 that the motions should be denied on timeliness grounds. The lack of any demonstrated prejudice to the parties, along with the need for a thorough review of the proposed decree are factors that weigh against denying these late filings.

Despite the complexity and the national importance of this case, until these new motions to participate were filed, there was a severe lack of information regarding the proposed consent decree. Only five public comments were filed during the public comment period. Neither the Justice Department nor Microsoft provided the Court with affidavits of experts. Moreover, the Justice Department failed to make available to the Court and to the public "any other materials and documents [in addition to the proposed consent decree] which the United States considered determinative in formulating" the proposed consent decree. § 16(b). At the hearings held prior to receipt of the motions to participate, the Court expressed its concern over the lack of meaningful information.[15]

---

**15.** On January 19, 1995 the Court issued the following order in an attempt to supplement the record and obtain information necessary to make its public interest determination.

The Government has declined to provide the Court any meaningful information concerning the substance of its investigation, *i.e.*, what it investigated and the findings it made. Microsoft has gone a little further than the Government and tried to allay certain of the Court's concerns. However, based on information received from the law firm of Wilson, Sonsini, some of the assurances provided by Microsoft have proved to be unreliable and contrary to fact.

If a Court is asked to approve a decree without information regarding the effect of the decree, then the Court's role becomes a nullity, exactly what the Tunney Act sought to prevent. The Justice Department and Microsoft's attempt to prevent the Court from considering information provided by third parties when they have not been forthcoming serves to thwart the Court's inquiry mandated by the Tunney Act. It was not until the third party motions were received that the Justice Department even filed an affidavit by an economist regarding whether the proposed decree will restore competitive balance to the operating systems market.

The Court will invoke the procedures found in § 16(f). In such an important and complex case, if the Court were not to invoke § 16(f) procedures for gathering relevant information, the proper exercise of the Court's discretion could be questioned. As Senator Tunney observed:

> [A]ll of the procedural devices cont[ain]ed in this subsection are discretionary in nature. They are tools available to the district court for its use, but use of a particular procedure is not required.... There are some cases in which none of these procedures may be needed. On the other hand, there have been and will continue to be cases where the use of many or even all of them may be necessary. In fact, in a very few complex cases, failure to use some of the procedures might give rise to an indication that the district court had failed to exercise its discretion properly.

119 Cong.Rec. 3453 (statement of Sen. Tunney).

All third party submissions received prior to the January 20, 1995 hearing will be made part of the record and have been considered in the Court's decision. Submissions by outside participants after the January 20, 1995 hearings were only considered if they had already been permitted by the Court (IDEA's January 24, 1995 and related filings) and to the extent that they offered legal arguments on the record already before the Court (Wilson, Sonsini's February 1, 1995 filing). The Court specifically did not consider the section of the February 1, 1995 filing by the law firm of Wilson, Sonsini that dealt with a certain redacted document.[16] Nor did

---

A hearing in the above captioned case has been scheduled for January 20, 1995. At that hearing, the Court requests the parties to respond to the following:

(1) How the proposed consent decree will restore competitive balance to the operating systems market?

(2) Why the proposed consent decree should not be amended to include:

(a) A provision that would clearly state that the consent decree applies to all operating systems commercially offered by Microsoft;

(b) A provision barring Microsoft from engaging in the practice of "vaporware" *i.e.*, releasing misleading information concerning the status of the introduction into the marketplace of new software products;

(c) A provision establishing a wall between the development of operating systems software and the development of applications software at Microsoft;

(d) A provision requiring disclosure of all instruction codes built into operating systems software designed to give Microsoft an advantage over competitors in the applications software market;

(e) A provision establishing an appropriate compliance apparatus (e.g., private inspector general, business practices officer or compliance officer) to ensure compliance with the decree;

(g) In the event Microsoft chooses not to pay I.D.E. Corporation the damages that it seeks, a provision that would avoid costly litigation. For example, allowing this Court to refer the matter to a Special Master.

Microsoft's response was that it would countenance no changes in the proposed decree. The Government stated that while it would not oppose the inclusion of a monitoring provision in the decree, it would oppose all other changes.

**16.** In response to the allegations made in the submissions that this Court has considered, the Government has insisted that Microsoft's illicit activities covered by the proposed consent decree be considered apart from the other matters addressed in the submissions. The Court knows of no theory of compartmentalization in carrying

the Court consider recent comments (dated February 13, 1995) submitted by Apple Computer, Inc.

■ While untimely filings ordinarily should not be condoned, the Court has allowed them in this case for two reasons. First and foremost, the information and arguments submitted are helpful, particularly the submissions received from Wilson, Sonsini. Second, the parties have not provided the Court with adequate, meaningful information. The Government, time after time, has refused to provide the Court with information concerning the substance of its investigation, *i.e.,* what it investigated and the findings it made.

The next question presented to the Court is whether the motions to participate as intervenors and/or amici curiae should be granted in the form requested.

### IV.D. Intervention

■ Both IDEA and CCIA have filed motions to intervene under Rule 24 of the Federal Rules of Civil Procedure.[17] Intervention is not a matter of right under the Tunney Act, as IDEA concedes. *United States v. Airline Tariff Publishing Co.,* 1993-1 Trade Cas. (CCH) ¶ 70,191, at 69,894, 1993 WL 95486 (D.D.C. Mar. 8, 1993) ("there is no right to intervene in a Tunney Act proceeding to determine whether a proposed consent decree is in the public interest."). As such, it is within the Court's discretion to grant or withhold intervention.

■ The Court declines to confer party status on IDEA and CCIA, with the concomitant right to participate fully in the proceeding, including the right to file an appeal. Pursuant to Rule 24(b), "[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." The Tunney Act allows for a variety of alternatives for the Court to receive relevant information in making its public interest determination. Intervention, while one method for gathering such information, would be too cumbersome and would unduly complicate these proceedings. Although the Court welcomes the submissions by IDEA and CCIA and will consider them in making its public interest determination, the Court does not find that allowing IDEA and CCIA to intervene would enhance the Court's inquiry. Moreover, such intervention could serve unduly to delay the resolution of this case. The rights of IDEA and CCIA to proceed as private litigants remain unaffected.

The Court will deny the motions by IDEA and CCIA to intervene. In the alternative, the Court will permit IDEA and CCIA to participate in the proceedings under the Court's authority pursuant to § 16(f)(3) to allow "participation in any other manner and extent which serves the public interest as the court may deem appropriate."

### IV.E. Participation as Amicus

■ The law firm of Wilson, Sonsini, Goodrich & Rosati by its partner, Gary Reback, filed a motion to enter an appearance amicus curiae on behalf of certain clients in the computer industry, who wish to remain anonymous. Both the Government and Microsoft argue that amici's request to appear anonymously is inappropriate. Section 16(f), however, authorizes the Court to accept submissions by "any interested persons or agencies." Thus, the Court could accept the submission directly from the law firm or the economists identified in the submission.[18]

out its responsibilities under the Tunney Act. Of course, related relevant conduct must be considered and all such conduct has been considered except for conduct outlined in the redacted document attached to the supplemental submission filed by Gary Reback on February 1, 1995. Since that information has not been made available to Microsoft, it has not been considered by the Court. This, however, should not preclude the Government from considering the new submission it has received from Mr. Reback, and if it believes such information is pertinent to this case, on notice to defendant, it may request the Court to reopen these proceedings so the information appropriately may be considered.

**17.** CCIA is comprised of approximately 25 member companies, many of whom are manufacturers and/or providers of computer products, computer software and services.

**18.** It is interesting to note that one of the public comments was filed by a law firm on behalf of

The Tunney Act confers broad powers to gather information. There is nothing in the statute that would preclude the Court from receiving information from those unwilling to identify themselves. It is preferable for persons to identify themselves to permit the Court to ascertain any bias on their part. However, there could be instances where the fear of retaliation by an alleged monopolist could deprive the public of relevant, material information. Indeed, Mr. Reback's clients have asserted the fear of retaliation as their reason for requesting anonymity. Nothing has been presented that would put into question the sincerity of their position.

Microsoft argues that to allow the amici to appear anonymously stymies the efforts of the parties and the Court to determine if there would be grounds for the Court's recusal. The Court does not know the identity of Mr. Reback's clients, whom Mr. Reback has identified as competitors of Microsoft. As a member of the Bar, it clearly would be incumbent on Mr. Reback to bring any disqualifying information to the Court's attention.

Microsoft's next challenge is that the submission goes beyond an analysis of the legal issues presented and seeks to introduce factual matters into the record. Microsoft contends that it is not the function of an amicus curiae to seek to introduce factual matters or to present the opinions of experts.

The actual label of "amicus curiae" on the submission is not relevant. Section 16(f) specifically permits the Court to authorize "participation in any other manner and extent which serves the public interest as the court may deem appropriate." To argue that the Court should not consider the amici submission because it goes beyond the role of the usual amici submission runs counter to the plain language and purpose of the statute. That the law enables this Court to consider a brief such as was submitted by amici is without question. Accordingly, the Court hereby grants the motion to file the

memorandum of amici curiae in opposition to the proposed final judgment.[19]

The Tunney Act envisions participation by interested persons in the consent decree approval process, and such participation is meant to ensure that the Court's public interest determination is fully informed. The Court as well as the parties would have preferred to receive these motions to participate at an earlier date during these proceedings. However, the substantive comments received from these third parties provide the process with the information necessary to foster an appropriate public airing of the issues. If the Court is to serve its role as an independent check, then it is vital that the Court receive responsible information from the public. The delay caused, which was minimal, certainly is justified by the need to consider the important issues presented.

## V. The Public Interest Determination

### V.A. Standard and Scope of Review

The Tunney Act requires that "before entering any consent judgment proposed by the United States ..., the court shall determine that entry of such judgment is in the public interest." 15 U.S.C. § 16(e). Congress passed the Tunney Act so that the courts would play an *independent* role in the review of consent decrees as opposed to serving as a mere rubber stamp. *See* S.Rep., at 4; H.R.Rep., at 8. In determining whether to approve or reject a consent decree, the Court must consider that "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *United States v. Western Electric Co.*, 993 F.2d 1572, 1577 (D.C.Cir.1993) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)). It is not for the Court to determine whether the settlement is the *best* possible in the Court's view, but instead, whether it is "within the reaches of the public interest." *United States v. Gillette Co.*, 406 F.Supp. 713, 716 (D.Mass.1975).

certain unnamed clients and neither the Justice Department nor Microsoft objected.

19. *But see* footnote 16, *supra,* with respect to certain materials not considered by the Court because they were not submitted to Microsoft.

■ In passing the Tunney Act Congress was concerned with the secrecy of corporations' dealings with the Government and the immense power that such corporations may wield. Senate Hearings, at 1 (statement of Sen. Tunney). Therefore, it would be an abdication of the Court's responsibility, as mandated by Congress, not to conduct a thorough review of this proposed decree. The role of the Court is to scrutinize the exercise not only of the Government's expertise but also of its good faith. *See Gillette,* 406 F.Supp. at 715. Approval should not automatically follow the review process no matter how incomplete or ineffective the Court finds the decree to be. *See United States v. American Tel. and Tel. Co.,* 552 F.Supp. 131, 151 (D.D.C.1982) *aff'd sub nom Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) ("It does not follow from these principles, however, that courts must unquestioningly accept a proffered decree as long as it somehow, and however inadequately, deals with the antitrust and other public policy problems implicated in the lawsuit.")

■ The Department of Justice argues that the scope of the Court's review is limited to both the alleged anticompetitive practices and the relevant markets set forth in the complaint. This position is not supported by the language of the statute, its legislative history, precedent or common sense.

The Justice Department relies on the Act's reference to both "termination of the alleged violations" and the "violation set forth in the complaint" to support its position. 15 U.S.C. § 16(e)(1)–(2). In citing small portions of the Act's language, the Government fails to consider the language of the statute as a whole:

> Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court may consider—
>
> (1) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, and any other considerations bearing upon the adequacy of such judgment;
>
> (2) the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1–2). Fifteen U.S.C. § 16(e)(1) merely informs the Court that the "termination of alleged violations" is *one* factor the Court "may consider" in making its determination. Section 16(e)(1) also explicitly states that the Court "may consider ... any other considerations bearing upon the adequacy of such judgment." The broad language of this last provision clearly shows that the court is not limited in its inquiry to the more specific provisions set forth in the same section.

■ The Justice Department also narrowly focuses on the wording in one part of Section 16(e)(2) (i.e. "violations set forth in the complaint."). In so doing, it ignores the language of the rest of the provision and therefore misreads its meaning.[20] Section 16(e)(2) states "the court may consider ... the impact of entry of such judgment upon the public generally and individuals alleging specific injury from the violation set forth in the complaint." 15 U.S.C. § 16(e)(2).[21] This section gives the Court the authority to consider not only the effect of the entry of the decree on those claiming to be hurt by the violations alleged in the complaint, but also

---

**20.** By focusing only on snippets of Section 16 to defend its position as to the narrow scope of the Tunney Act, the Department ignores the cardinal rule of statutory interpretation "that a statute is to be read as a whole." *King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991); *see also DAE Corporation v. Engeleiter,* 958 F.2d 436, 439 (D.C.Cir. 1992).

**21.** The legislative history shows that the inclusion in the bill of specific factors that the Court "may consider," such as "termination of [the] alleged violation," was not intended to limit the scope of the Court's inquiry. 119 Cong.Rec. 24,599 (1973) (statements of Sen. Tunney).

the effect on the public. The language of the Act does not restrict the scope of inquiry into the effect of the decree on the public to the specific injuries alleged in the complaint.

■ The legislative history supports the position that the Court may look beyond the face of the complaint in evaluating the public interest.[22] In hearings on the Tunney Act, the then Deputy Assistant Attorney General of the Antitrust Division made clear that the Justice Department's interpretation of the bill was that the Court, in certain circumstances, would look not only at whether the decree adequately addressed the complaint, but also at whether the complaint itself was adequate. "[T]his inquiry apparently would encompass not only whether the relief is adequate in view of that sought in the complaint, but whether the Government sought appropriate relief in the complaint itself." *Consent Decree Bills: Hearings Before the Subcommittee on Monopolies and Commercial Law of the Committee on the Judiciary, House of Representatives,* 93d Cong., 1st Sess. 87 (1973) (statement of Hon. Bruce B. Wilson, Deputy Assistant Attorney General, Antitrust Division, United States Department of Justice).[23]

In some instances, courts evaluating consent decrees under the provisions of the Tunney Act have considered markets and practices outside the scope of the complaint. For example, in *AT & T,* Judge Harold Greene conditioned the Court's approval of the decree, in part, on the addition of a provision that would bar AT & T's entry into the nascent electronic publishing market. *AT & T,* 552 F.Supp. at 151–83. Judge Greene did this even though the Government had not alleged *any* anticompetitive practices by AT & T in this market. In addition, the elec-

tronic publishing market is arguably not part of the relevant market identified in the complaint.

■ Judge Greene's opinion in *AT & T* clearly explained why, in some instances, the Court *cannot* limit itself to the decree's effect on the practices alleged in the complaint. In order to determine whether a decree is in the public interest, the Court must evaluate whether it meets the test of a valid antitrust remedy, to "effectively pry open to competition a market that has been closed by defendant['s] illegal restraints." *AT & T,* 552 F.Supp. at 150 (quoting *International Salt Co. v. United States,* 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947)). Simply prohibiting repetition of the specific conduct in the complaint may not in all cases achieve that goal. Therefore, the Court cannot limit the scope of its considerations in the way the Government has suggested.

■ While the Court must show some deference to the discretion of the Justice Department, *see Western Electric,* 993 F.2d at 1577, such deference does not preclude the Court's taking into consideration practices and markets that the Government has failed to address. *Cf. Gillette,* 406 F.Supp. at 715 ("Congress did not intend the court's action to be merely pro forma, or to be limited to what appears on the surface.").

Senator Tunney, the law's co-sponsor, recognized the possible adverse consequences from entry of a consent decree that fails to address anticompetitive practices outside the scope of the decree. "[A] bad or inadequate consent decree may as a practical matter foreclose further review of a defendant's practices both inside and outside the scope of the decree." 119 Cong.Rec. 3451 (statement

---

**22.** The Justice Department has cited a statement from the Senate Reports to support its position that the Court is restricted to considering only the allegations in the complaint in analyzing whether the decree is in the public interest. *See* Department of Justice Motion for Final Judgment at 12 (citing S.Rep. No. 298, 93d Cong., 1st Sess. at 3 (1973)). Their motion mischaracterizes the statement. The statement simply stands for the proposition that the Court needs to know what other relief the Department considered when the Court evaluates whether relief is appropriate with reference to the allegations in the complaint. The statement does not support the Gov-

ernment's assertion the Court may consider *only* the relationship between the actual allegations and the remedies in the decree. In fact, the statute gives the Court a much broader scope of review. *See supra.*

**23.** The then Deputy Attorney General made clear that the Justice Department did not approve of the broad scope of the bill. His testimony made equally clear that the bill appeared to give the Court authority to look beyond the allegations in the complaint. *Id.*

of Sen. Tunney). The public interest may be ill-served if the Court can look only at the market and practices alleged in the complaint because of the opportunity costs of failing to address severe anticompetitive practices that do not appear in the complaint.

If the Court's scope of review is as narrow as the Government claims, the Government could effectively foreclose judicial review of the decree. For example, the Government could initiate a massive antitrust probe and find significant violations in a large market. Then, bowing to political or other pressures, the Government could write a complaint that alleges only minor anticompetitive practices in a very small market and file it contemporaneously with a decree that addresses those limited violations. Under the Government's rationale, the Court could only consider whether the decree adequately addressed the alleged violations. If its scope of review were so limited, the Court would have to approve the decree. The Tunney Act as well as common sense dictate that entry of such a decree would not be in the public interest.

## V.B. Public Interest Determination

■ The Court cannot find the proposed decree to be in the public interest for four reasons. First, the Government has declined to provide the Court with the information it needs to make a proper public interest determination. Second, the scope of the decree is too narrow. Third, the parties have been unable and unwilling adequately to address certain anticompetitive practices, which Microsoft states it will continue to employ in the future and with respect to which the decree is silent. Thus, the decree does not constitute an effective antitrust remedy. Fourth, the Court is not satisfied that the enforcement and compliance mechanisms in the decree are satisfactory.

### V.B.1. Insufficient Information

■ The parties did not create the necessary record to enable the Court to make its public interest determination. While the scrutiny that a proposed consent decree requires is dependent upon the particular facts of the case, at a minimum, the Court should be apprised of the following:

(1) The broad contours of the investigation *i.e.*, the particular practices and conduct of the defendant that were under investigation along with the nature, scope and intensity of the inquiry;

(2) With respect to such particular practices and conduct, what were the conclusions reached by the Government;

(3) In the settlement discussions between the Government and defendant: (a) what were the areas that were discussed, and (b) what, if any, areas were bargained away and the reasons for their non-inclusion in the decree;

(4) With respect to the areas not discussed at the bargaining table or not bargained away, what are the plans for the Government to deal with them *i.e.*, is the investigation to continue, and, if so, at what intensity, or if the investigation is to be closed, then the Government must explain why it is in the public interest to do so.

Basically, other than being told the Government spent a great deal of time on a wide ranging inquiry and that the defendant is a tough bargainer, the Court has not been provided with the essential information it needs to make its public interest finding.[24] To make an objective determination, a court must know not only what is included in the decree but also what has been negotiated out, directly as well as indirectly *i.e.*, what is the understanding of the parties as to what, if any, additional action the Government will or will not take with respect to matters that were inquired into, but with respect to which the decree is silent.

■ One of the main purposes of the Tunney Act was to bring the consent decree process into the open. Senate Hearings, at 1

---

**24.** In the hearing on January 20, 1995, the following colloquy took place:

The Court: Well, every time I ask you I get stonewalled. Every time—not you—I ask your people what is it? What are the facts? They stone-wall me. And I don't like to be stone-walled.

Ms. Bingaman: Okay. You know why I'm stone-walling you? You bet.

Transcript of Hearing, January 20, 1995, p. 46.

(statement of Sen. Tunney). In this case, the Government has filed its complaint and decree contemporaneously so the Court has no insight into what charges the Government originally intended to file. The Court does not know whether the Government has bargained away other pernicious practices that were deleterious to the public. The Government has steadfastly refused to address any conduct of the defendant beyond that presented in the four corners of the decree. The Government has taken the position that the Tunney Act limits the Court's review to only those matters contained in the decree and the Court is not permitted to explore any other areas and cannot even consider evidence received from third parties (*i.e.*, pursuant to their comments) that legitimately raise questions as to whether the defendant has been engaged in anticompetitive practices not included in the decree. The Tunney Act does not dictate this kind of sterile review nor does it justify the stonewalling that has taken place in these proceedings. There is absolutely nothing in the Tunney Act that would circumscribe the Court's review as the Government suggests. *See* Section V.A., *supra*. To so hold would render the Act a nullity. "Tunney Act courts" are not mushrooms to be placed in a dark corner and sprinkled with fertilizer.

### V.B.2. Scope of the Decree

■ The Court finds the decree on its face to be too narrow. Its coverage is restricted to PCs with x86 or Intel x86 compatible microprocessors. The decree covers only MS–DOS and Windows and its predecessor and successor products. Neither party has even addressed the Court's concern that the decree be expanded to cover all of Microsoft's commercially marketed operating systems. Given the pace of technological change, the decree must anticipate covering operating systems developed for new microprocessors.[25] In addition, taking into account Microsoft's penchant for narrowly defining the antitrust laws, the Court fears there may be endless debate as to whether a new operating system is covered by the decree.[26]

### V.B.3. Ineffective Remedy

■ The Court cannot find the proposed decree to be in the public interest because it does not find that the decree will "effectively pry open to competition a market that has been closed by defendant['s] illegal restraints." *AT & T*, 552 F.Supp. at 150. During the period in which this matter was before the Court the Government did little to show that the decree would meet this test beyond telling the Court that it had labored hard, that the decree was good, and that it should be approved. At the eleventh hour, only after the Court again requested information to allay its concerns, did the Government finally produce an affidavit from Nobel Laureate economist, Professor Kenneth Arrow.[27]

The affidavit made three main points: 1) that the market is an increasing returns market with large barriers to entry; 2) that the violations set forth in the complaint contributed in some part to Microsoft's monopoly position; and 3) that the decree will eliminate "artificial barriers that Microsoft had erected to prevent or slow the entry of competing suppliers of operating system software products."

The Court does not doubt the Government's position that the practices alleged in the complaint are artificial barriers.[28] Nor does it doubt that the decree does address *those practices*. But what the Government fails to show is that the proposed decree will open the market and remedy the unfair ad-

---

**25.** It is difficult to imagine in this dynamic area that by the end of the period (7 years) the decree will be in effect, there will not be wholesale change with respect to microprocessors and operating systems.

**26.** See discussion *infra*, at page 338.

**27.** When asked whether Professor Arrow was present and prepared to testify, the Government stated he was not available to testify at the hearing.

**28.** "The decree is to be tested on the basis of the relief provided, on the assumption that the government would have won." *Gillette,* 406 F.Supp. at 716 n. 2; *see also United States v. Airline Tariff Pub. Co.,* 836 F.Supp. 9, 12 n. 4 (D.D.C.1993).

vantage Microsoft gained in the market through its anticompetitive practices.

Professor Arrow's affidavit states that the operating systems market is an increasing returns market. In layman's terms that means that once a company has a monopoly position, it is extremely hard to dislodge it. Professor Arrow and the Government also concur that part of Microsoft's monopoly position is attributable to the artificial barriers it erected. Professor Arrow only argues that the decree prospectively removes these artificial barriers. He does not explain how the decree remedies the monopolist position Microsoft has achieved through alleged illegal means *in an increasing returns market.* If it is concededly difficult to open up an increasing returns market to competition once a company has obtained a monopoly position, the Government has not shown how prospectively prohibiting violative conduct that contributed to defendant's achieving its monopoly position will serve to return the market to where it should have been absent its anticompetitive practices.[29] Simply telling a defendant to go forth and sin no more does little or nothing to address the unfair advantage it has already gained. In short, given the Government's expert's own analysis of this market, the decree is "too little, too late."

■ The proposed decree without going further, is not in the public interest because it does not meet the test of an effective antitrust remedy.[30] The decree deals with licensing and non-disclosure practices that the Government found to be anticompetitive and detrimental to a free and open market. What the decree does not address are a number of other anticompetitive practices

that from time to time Microsoft has been accused of engaging in by others in the industry. Since a Court cannot shut its eyes to the obvious, it has asked the parties to discuss these widespread public allegations. The Government has refused, and Microsoft has claimed that the accusations are false.

The accusations range from charges that Microsoft engages in the practice of vaporware *i.e.,* the public announcement of a computer product before it is ready for market for the sole purpose of causing consumers not to purchase a competitor's product that has been developed and is either currently available for sale or momentarily about to enter the market. Other allegations include charges that Microsoft uses its dominant position in operating systems to give it an undue advantage in developing applications software and that it manipulates its operating systems so competitors' applications software are inoperable or more difficult for the consumers to utilize effectively.

Throughout these proceedings, this Court has expressed repeated concern about these allegations, in part, because it is concerned that if they are true and defendant continues to engage in them, it will continue to hold and possibly expand its monopoly position, even if it ceases the practices alleged in the complaint.

■ The Court has been particularly concerned about the accusations of "vaporware." Microsoft has a dominant position in the operating systems market, from which the Government's expert concedes it would be very hard to dislodge it. Given this fact, Microsoft could unfairly hold onto this position with aggressive preannouncements of

---

**29.** The legislative history of The Tunney Act gives further support to the argument that the Court may find a decree is not in the public interest because of its failure to go beyond mere prospective remedies. Senator Tunney cited the antitrust decrees in the "smog case" and the IT & T consent decree as examples of abuses the Act was drafted to remedy. In the "smog case" Senator Tunney noted the failure of the decree to "require the auto industry to undo its past damage." Senator Tunney criticized the failure of the IT & T decree to force IT & T to disgorge its profits even though IT & T prospectively had to divest itself of certain companies. 119 Cong.

Rec. 24,598 (1973). *See also* testimony of Judge J. Skelly Wright, Senate Hearings, at 147.

**30.** The goal of the remedy is not only to prevent future occurrences of illegal conduct, but also to cure the *ill effects* of such conduct and to deny the violator future benefits of that conduct. *See United States v. United States Gypsum Co.,* 340 U.S. 76, 88–89, 71 S.Ct. 160, 169–70, 95 L.Ed. 89 (1950); *Wilk v. American Medical Association,* 671 F.Supp. 1465, 1484–85 (N.D.Ill.1987), *aff'd* 895 F.2d 352 (7th Cir.1990), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990).

new products in the face of the introduction of possibly superior competitive products. In other words, all participants concede that consumers and OEMs will be reluctant to shift to a new operating system, even a superior one, because it will mean not only giving up on both its old operating systems and applications, but also risking the possibility that there will not be adequate applications to run on the superior product. If this is true, Microsoft can hold onto its market share gained allegedly illegally, even with the introduction of a competitor's operating system superior to its own. By telling the public, "we have developed a product that we are about to introduce into the market (when such is not the case) that is just as good and is compatible with all your old applications," Microsoft can discourage consumers and OEMS from considering switching to the new product. It is for this reason that courts may consider practices outside the complaint. *See AT & T*, 552 F.Supp. at 150.[31]

With respect to the vaporware claim when this matter was raised at the November 2, 1994 status call, counsel for Microsoft stated the charge was false. The colloquy with the Court was as follows:

> The Court: Well how do you answer those charges?
>
> Counsel for Microsoft: Those charges we believe are entirely false.
>
> The Court: In other words, the vaporware charge is false?
>
> Counsel for Microsoft: That's correct.

Transcript of Hearing, September 29, 1994, p. 15.

When questioned about the practice, the Government refused to disclose what it knew about the practice or what investigation it had conducted with respect to it.

This was the state of the record until Mr. Reback submitted two documents to the Court (Court Exhibits 1 and 2).[32] Both of these documents are internal Microsoft records. They are part of two Microsoft employee evaluation forms. In the first, the Microsoft employee writes that during the past six months he engaged in the following beneficial activities for Microsoft, "QB3 preannounce to hold off Turbo buyers." [33]

The second document is even more specific. In a self-evaluation, a Microsoft employee wrote, "I developed a rollout plan for QuickC and CS that focused on minimizing Borland's first mover advantage by *preannouncing with an aggressive communications campaign.*" (emphasis added) These documents indicate that the highest officials of the company knew of the practices that were utilized to impact adversely on the market plans of a competitor. Whether the documents are actionable or not, certainly at a minimum they require explanation from the parties. No satisfactory explanation has been given.

Although Microsoft acknowledges the authenticity of the documents, it denies they describe the practice of vaporware and indeed, states that the practice that is described is a perfectly legitimate competitive practice. When pressed as to why the practices described in the documents were not vaporware, counsel for Microsoft stated he would limit "vaporware" to those instances where no product at all exists at the time of the so-called "preannouncement." According to counsel, it does not even matter that the date for introduction of the preannounced product is not met. Counsel further advised the Court that he would advise his client to continue to engage in the described practices.[34]

---

**31.** The Court may not only consider practices outside the complaint, it may also prohibit such practices even if they have not been found to be unlawful if that is necessary to formulate an effective decree to prevent the recurrence of monopolization. *See AT & T*, 552 F.Supp. at 150 n. 80 (citing with approval *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 346–47 (D.Mass.), *aff'd*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) and *Hartford–Empire Co. v. United States*, 323 U.S. 386, 409, 65 S.Ct. 373,

385, 89 L.Ed. 322 (1945)); *see also United States Gypsum Co.*, 340 U.S. at 89, 71 S.Ct. at 169.

**32.** According to Mr. Reback, these documents come from public sources.

**33.** QB3 is Microsoft software; Turbo is software developed by Borland, one of Microsoft's competitors.

**34.** Transcript of Hearing, January 20, 1995, p. 110–11.

At the January 20, 1995 hearing, the Government merely acknowledged receipt of the documents. It outright refused to discuss them or to state what consideration it has given to them. It declined to state whether it had even interviewed the authors of the documents. In a subsequent filing, the Government has taken the following position: "[P]roduct preannouncements do not violate antitrust laws unless those preannouncements are knowingly false and contribute to the acquisition, maintenance, or exercise of market share." Of course, this is not the time or place to debate the Government's rather narrow view of this highly questionable practice. It is obvious that the Government has adopted a criminal standard and may have ignored the fact that it also has plenary civil authority to enjoin violative practices without having to prove criminal culpability.

Regardless of how narrow the Government's view is, it is incumbent on the Government to address whether the defendant has been preannouncing products and what effect, if any, such preannoucements have had in eliminating competition in an increasing returns market where the market has clearly been tipped. Even if Microsoft's current practice of "preannouncing" did not meet the Government's definition of vaporware, shouldn't the Court be advised whether there is a basis for seeking to limit the practice in fashioning an antitrust remedy? As Judge Green held in the *AT & T* case, even practices that have not been found to be unlawful can be prohibited if they prevent the prying open of the market that has been closed through illegal restraints. *AT & T*, 552 F.Supp. at 150. Even if these practices might be legal in another context, defendant's ability to use them to maintain a monopoly position that it gained in part through improper licensing and nondisclosure agreements certainly raises the question whether a decree that does not address such anticompetitive practices, is in the public interest.

■ This Court cannot ignore the obvious. Here is the dominant firm in the software industry admitting it "preannounces" products to freeze the current software market and thereby defeat the marketing plans of competitors that have products ready for market. Microsoft admits that the preannouncement is solely for the purpose of having an adverse impact on a competitor's product. Its counsel states it has advised its client that the practice is perfectly legal and it may continue the practice. This practice of an alleged monopolist would seem to contribute to the acquisition, maintenance, or exercise of market share.

The Government has pressed for the adoption of its decree on the grounds that it will open up competition. Given the Government's desire to open up competition why does it not want to take on the vaporware issue?

When the Court gave Microsoft the opportunity to disavow this practice by an undertaking it declined to do so. What is more, the Government told the Court that if it. conditioned its approval on Microsoft's undertaking no longer to engage in the practice, the Government would withdraw its approval of the decree even if Microsoft agreed to the undertaking.

The Court cannot sign off on a decree knowing that the defendant intends to continue to engage in an anticompetitive practice without the Government providing a full explanation as to its "no action" stance. It would almost be the equivalent of a Court accepting a probationary plea from a defendant who has told the Court he will go out and *again engage* in inappropriate conduct.

### V.B.4. Compliance

■ The only change in the decree that the Government stated it would accept is the Court's suggestion that Microsoft establish an internal mechanism to monitor the decree. This too Microsoft has declined even to consider. Microsoft's position is that its 50 or so in-house lawyers, along with its outside retained counsel, are sufficient to monitor the decree. This is the same group that has advised its client that "product preannouncements" to impede competition is proper behavior.

This Court finds itself in a position similar to that of Judge Greene in *AT & T*, who refused to approve the decree without modi-

fication because of his concern as to its compliance and enforcement.[35]  *AT & T,* 552 F.Supp. at 214–17.

Based on Microsoft's counsel's representations to this Court, the Court is concerned about the question of compliance.  This concern is heightened because even though the Company on prior occasions has publicly stated it does not and will not abuse its dominant position in the operating systems market vis-a-vis its development of application products, it has refused to give the Court the same assurance.  Without a compliance mechanism, the Court cannot make the public interest finding.  This is particularly so because Microsoft denies that the conduct charged in the Government's complaint to which it has consented, violates the antitrust laws.

This is clearly the kind of case that Congress had in mind when it passed the Tunney Act.  Microsoft is a company that has a monopolist position in a field that is central to this country's well being, not only for the balance of this century, but also for the 21st Century.  The Court is certainly mindful of the heroic efforts of the Antitrust Division to negotiate the decree.  There is no doubt its task was formidable.  Here is a company that is so feared by its competitors that they believe they will be retaliated against if they disclose their identity even in an open proceeding before a U.S. District Court Judge.

The picture that emerges from these proceedings is that the U.S. Government is either incapable or unwilling to deal effectively with a potential threat to this nation's economic well being.  How else can the four year deadlocked investigation conducted by the FTC be explained.  What is more, the Justice Department, although it labored hard in its follow up investigation, likewise was unable to come up with a meaningful result.

It is clear to this Court that if it signs the decree presented to it, the message will be that Microsoft is so powerful that neither the market nor the Government is capable of dealing with all of its monopolistic practices.  The attitude of Microsoft confirms these observations.  While it has denied publicly that it engages in anticompetitive practices, it refuses to give the Court in any respect the same assurance.[36]  It has refused to take even a small step to meet any of the reasonable concerns that have been raised by the Court.[37]

The Government itself is so anxious to close this deal that it has interpreted certain anticompetitive practices so narrowly that it possibly has given the green light for persons to engage in anticompetitive practices with impunity.  To in any way condone the practice of announcing products before they are ready for market to freeze a competitor's product is terribly bothersome to this Court.  "Vaporware" is a practice that is deceitful on its face and everybody in the business community knows it.  Why else has the business community dubbed the practice "vaporware?"  It is interesting that business leaders know that the practice is improper but the Government does not.  Philip K. Howard's comment from his book "The Death of Common Sense" might well be right: "Law designed to make Americans' lives safer and fairer has now become an enemy of the people."

The Tunney Act provides that a Court must find that a proposed consent decree is in the public interest before it shall enter an order to that effect.  Because of the many concerns that the Court has, that finding cannot be made on the present record.

The Court fully understands the role the judiciary plays in this society.  It has no interest in intruding on the prerogatives of the executive branch.  The Court's only rea-

---

**35.** The proposed *AT & T* decree and the decree before this Court contain almost identical provisions regarding the Court's role in enforcement and continuing jurisdiction.

**36.** Microsoft has stated to the Press over the years that there is a "Chinese Wall" between its operating systems and applications divisions. *See* Memorandum of Amici Curiae in Opposition

to Proposed Final Judgment, p. 19.  In Microsoft's submission to the Court, it maintains that there is no such separation and that one is not necessary. *See* Memorandum of Microsoft Corporation in Support of Proposed Final Judgment, p. 7 n. 12.

**37.** See footnote 15, *supra.*

son for being involved in this case is because of the dictates of the Tunney Act. To make the public interest finding required by the Tunney Act, the Court has to be confident of its decision. It does not have the confidence in the proposed antitrust decree that has been presented to it. In part, this lack of confidence is a result of the Government's "stonewalling" position.

Microsoft has done extremely well in its business in a relatively short period of time, which is a tribute both to its talented personnel and to this nation's great ethic that affords every citizen the ability to rise to the top. Microsoft, a rather new corporation, may not have matured to the position where it understands how it should act with respect to the public interest and the ethics of the market place. In this technological age, this nation's cutting edge companies must guard against being captured by their own technology and becoming robotized.

Some might suggest that disapproval of the proposed decree serves little purpose since all that the Government will be able to achieve if it prevails after a lengthy trial would be the relief set forth in the proposed consent decree.

This is not necessarily so. First after a fully successful litigated case and findings made, the judgment may have preclusive effect in other cases. Second, unlike a denial in a consent decree, once a court issues its findings and conclusions, a party's denial of liability has no effect unless the party is successful on appeal. Third, a court of equity has a wide range of remedies it can fashion to protect the public interest. After a trial in which the Government prevails, the Court is not limited solely to the relief set

forth in the Government's earlier proposed negotiated settlement. Certainly, all parties to a litigation face certain risks. While the risks are greater, so are the rewards.[38] For all of the above reasons, the Court finds that the proposed antitrust consent decree is not in the public interest. An appropriate order accompanies this memorandum opinion.

## ORDER RE MOTION TO APPROVE THE CONSENT DECREE

The issue before this Court is whether the entry of the proposed antitrust consent decree between Microsoft Corporation and the United States is in "the public interest."[1] The Court cannot find the proposed consent decree to be in the public interest for four reasons. First, the Government has declined to provide the Court with the information it needs to make its proper public interest determination. Second, the scope of the decree is too narrow. Third, the parties have been unable and unwilling adequately to address certain anticompetitive practices which Microsoft states it will continue to employ in the future and with respect to which the decree is silent. Thus, the decree does not constitute an effective antitrust remedy. Fourth, the Court is not satisfied that the enforcement and compliance mechanisms in the decree are satisfactory. Based on the above reasons, the Court hereby **ORDERS** that the motion to approve the consent decree be **DENIED.**

A status call on this matter will be held on March 16, 1995 at 10:00 a.m. in Courtroom 6.

---

**38.** The Government has expressed concern that if the Court rejects the consent decree, Microsoft would be able to reinstitute the prohibited practices that have been banned by the consent decree with which Microsoft has voluntarily agreed to comply pending this Court's determination. The Government's fears are misplaced. The Government is reminded that it has filed with the Court a complaint in which it has prayed for an injunction against Microsoft enjoining it "from engaging or carrying out, renewing or attempting to engage, carry out or renew any contracts, agreements, practices or understandings in violation of the Sherman Act [and] (4) that plaintiffs

have such other relief that the court may consider necessary or appropriate to restore competitive conditions in the markets affected by Microsoft's unlawful conduct."

If Microsoft wants to dissolve its "standstill" agreement with the Government pending the completion of these proceedings, the Government certainly can move for a preliminary injunction pending conclusion of the litigation. If it can prove to the Court the merits of its position, it will be entitled to appropriate relief.

**1.** 15 U.S.C. § 16(e) (Supp.1994) (Tunney Act).